UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                               :

FRANCINE MOCCIO,                        :

                       Plaintiff,    :           09 Civ. 3601 (PAE)

                                      :         OPINION & ORDER

                 -v-                  :

                                      :

CORNELL UNIVERSITY, NEW YORK STATE    :
SCHOOL OF INDUSTRIAL AND LABOR      :
RELATIONS, and HARRY C. KATZ,        :

                                    :

                      Defendants.    :

                                    :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Francine Moccio brings claims of gender discrimination, retaliation, unequal

pay, and breach of contract against Cornell University ("Cornell"), the New York State School of

Industrial and Labor Relations ("the ILR School"), and Harry C. Katz (collectively,

"defendants"), under the Equal Pay Act, 29 U.S.C. § 206 ("EPA"), Age Discrimination in

Employment Act, 29 U.S.C. § 621 ("ADEA"), Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. EXEC. LAW §

290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y. CITY ADMIN. CODE § 8–

101 *et seq.* ("NYCHRL"), and New York common law.  Moccio was a Senior Extension

Associate and director of the Institute for Women and Work, a center for the study and advocacy

of working women's issues at the ILR School's Extension Division.  She alleges that defendants

unlawfully discriminated against her on the basis of her gender, retaliated against her for having

engaged in protected activity, and breached an employment contract by terminating her before

the end of the contract term.  Defendants deny all of Moccio's claims.

Defendants move for summary judgment on Moccio's claims under Federal Rule of Civil

Procedure 56. For the reasons that follow, defendants' motion is granted.

## I.     Background[1]

### A.  Key Persons, Entities, and Terms

Between 1990 and June 2009, Moccio was employed by Cornell as a Senior Extension

Associate in ILR's Extension Division. Pl.'s 56.1 ¶ 4. Moccio holds a bachelor's degree in

sociology from the City University of New York at Lehman College in the Bronx, New York,

and a master's degree and a doctoral degree in anthropology from the New School for Social

Research in Manhattan, New York. Pl.'s 56.1 ¶ 3.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' pleadings
and their submissions in support of and in opposition to the instant motion—specifically, the
Affidavit of Susanne M. Bruyere in Support of Defendants' Motion for Summary Judgment
("Bruyere Aff.") (Dkt. 53); Affidavit of Joseph Grasso in Support of Defendants' Motion for
Summary Judgment ("Grasso Aff.") (Dkt. 54); Affidavit of Cathy Mooney in Support of
Defendants' Motion for Summary Judgment ("Mooney Aff.") (Dkt. 55); Affidavit of Harry C.
Katz in Support of Defendants' Motion for Summary Judgment ("Katz Aff.") (Dkt. 65);
Affidavit of Francine Moccio in Opposition to Defendants' Motion for Summary Judgment
("Moccio Aff.") (Dkt. 69) and attached exhibits; Affidavit of David M. Marek in Opposition to
Defendants' Motion for Summary Judgment ("Marek Aff.") (Dkt. 71) and attached exhibits;
Defendants' Local Rule 56.1 Statement of Material Facts (Dkt. 74) ("Defs.' 56.1"); Plaintiff's
Local Rule 56.1 Statement of Material Facts (Dkt. 72) ("Pl.'s 56.1"). Because Plaintiff's 56.1
Statement has two distinct parts, organized in differing fashions, the document is cited herein in
two ways: Where Moccio states facts in the first instance, the Court cites to specific paragraphs;
where Moccio responds to facts stated in Defendants' 56.1 Statement, the Courts cites to the
relevant page numbers. Where facts stated in a party's Statement of Material Facts are supported
by testimonial or documentary evidence, and denied by a conclusory statement by the other party
without citation to conflicting testimonial or documentary evidence, the Court finds such facts to
be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of
material facts set forth in the statement required to be served by the moving party will be deemed
to be admitted for purposes of the motion unless specifically controverted by a correspondingly
numbered paragraph in the statement required to be served by the opposing party."); *id.* at
56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material
fact[] must be followed by citation to evidence which would be admissible, set forth as required
by Fed. R. Civ. P. 56(c)."); *see, e.g.*, Pl.'s 56.1 at 47 (denying a declaration in defendants'
Statement of Material Fact that was supported by testimonial evidence, stating only,
inaccurately, that "there is no evidence in the record supporting this allegation").

The ILR School is one of four "contract colleges" at Cornell.  It is a partnership, created by statute, between New York State and Cornell.  Katz Aff. ¶ 3.  The ILR School's mission is to "conduct educational, research, and extension programs on the workplace, workplace relations, labor, human resources, and employer/employee relations."  *Id.* ¶ 3.  The ILR School offers a four-year undergraduate program in industrial and labor relations, a master's degree, a doctoral degree, and various non-degree programs for practitioners.  Compl. ¶ 4; Katz Aff. ¶ 3.  The faculty at the ILR School specializes in personnel and human resource management, labor law and history, and social statistics.  Compl. ¶ 4.  New York State provides partial support for Cornell's contract colleges, including ILR.  *Id.*  The state appropriations for ILR come through the State University of New York ("SUNY") system.  Defs.' 56.1 ¶ 12.

The ILR Resident Division includes undergraduate and graduate degree programs, as well as academic research programs.  Katz Aff. ¶ 4.  The programs associated with the Resident Division are located primarily on Cornell's main campus in Ithaca, New York.  *Id.*

The ILR Extension Division facilitates programs designed for working practitioners.  Defs.' 56.1 ¶ 8; Katz Aff. ¶ 5.  At all relevant times, there were four regional Extension Division offices—in Albany, Buffalo, Manhattan, and Rochester—and most programming originated from those offices.  *Id.*  Moccio primarily worked out of the Extension Division office in New York City.  *See* Deposition of Francine A. Moccio ("Moccio Dep."), Marek Aff. Ex. 1, at 23.  Most faculty members who teach in the Extension Division are extension associates, or, like Moccio, senior extension associates ("SEAs").  Defs.' 56.1 ¶ 9.

Defendant Harry Katz has been the Dean of the ILR School at Cornell University since July 1, 2005, and a tenured professor at ILR since 1985.  Compl. ¶ 5; Defs.' 56.1 ¶ 2.  Under Cornell's bylaws, as dean, Dean Katz had ultimate responsibility for all personnel matters in the

ILR School.  Defs.' 56.1 ¶ 3.  As of July 1, 2005, the ILR Extension had 132 employees.  *Id.* ¶ 11.

Susanne Bruyere has been the Associate Dean of Outreach/Extension at ILR since fall 2005.  Defs.' 56.1 ¶ 4; Deposition of Susanne Bruyere, Marek Aff. Ex. 7, at 16 ("Bruyere Dep.").  Bruyere is also a professor at ILR, and the director of the Employment and Disability Institute at ILR.

SEAs are employees of ILR with limited term, non-tenure track positions.  Defs.' 56.1 ¶ 10; Katz Aff. ¶ 6; Defs.' 56.1 Ex. 5 ("There are no tenure track faculty appointments in the Extension Division.  Tenure track faculty lines (and appointments) exist only in the Resident Division.").  SEAs are each initially appointed to a three-year term at the ILR School, and may later be renewed for successive terms.  Bruyere Dep. at 8.  Each reappointment is "contingent upon available funding, satisfactory performance and available work."  Defs.' 56.1 Ex. 40.

The Institute for Women and Work (the "IWW") was founded in 1976 as a center for the study and advocacy of working women's issues.  Pl.'s 56.1 ¶ 1.  The IWW received funding from state and private grants.  *Id.* ¶ 2.  In 1990, Cornell hired Moccio as Director of the IWW and appointed her to the position of SEA.  From 1990 through June 30, 2009, Moccio was IWW's only full-time employee.  *Id.* ¶ 4.  In or around 1993, Moccio successfully completed her first peer review process, and was reappointed to another three-year term.  Moccio Aff. ¶ 8.

### B.  Events Relevant to Ms. Moccio's Claims

Moccio's claims arise out of her dealings with various members of the Extension Division faculty and administration between 2005 and her termination in 2009, and implicate a number of events during that period: (1) the reorganization of the ILR Extension Division in 2005 that caused Moccio to be reassigned to a new thematic group and to report to a new

[4]

supervisor; (2) a request by Moccio's supervisor that she fill out a Flexplace Agreement; (3) a decision to move Moccio to a new office, first raised in 2006 and implemented in 2008; (4) Extension Division workforce reductions in 2006; (5) a "lower than average" salary increase in 2006; and (6) a request by Moccio's supervisor that she register as a lobbyist with the State of New York.  Moccio contends that these incidents were adverse employment actions motivated by gender discrimination and were undertaken in retaliation for her having engaged in protected activity.  Moccio also contends that (7) there was gender-based unequal pay in the ILR Extension Division as of 2008, reflecting gender-based discrimination; and (8) her termination, communicated to her in 2008 and effective in 2009, was in retaliation for prior protected acts. The following are the facts relevant to these events.

### C.  The ILR Extension Division's Reorganization in 2005

When Dean Katz became dean in July 2005, he learned that the Extension Division was running a deficit due to high expenses, low revenue, and declining support from New York State. Defs.' 56.1 ¶ 15.  Starting in fall 2005, Dean Katz reorganized the Extension Division by sorting the professional staff into eight new thematic groups, organized by their substantive work.  Pl.'s 56.1 ¶ 8; Defs.' 56.1 ¶ 16.  The groups were: Organizational Change Management; Development and Human Resources Management; Labor Union; Workforce Industry and Economic Development; Diversity and Inclusion; Employment and Disability; Conflict Resolution; and Employment and Labor Law.  Pl.'s 56.1 ¶ 8.  Dean Bruyere advised Dean Katz as to the reorganization, and assisted him in selecting team leaders, who were four women and four men. Defs.' 56.1 ¶ 4; Bruyere Dep. at 15–16; Bruyere Aff. ¶ 2, 8.

At the time he took office, Dean Katz also perceived that "ILR did not have well-documented records regarding the performance of the individuals who worked in the Extension

Division." Katz Aff. ¶ 28. "There had been a history of limited performance reviews and in the reviews that had occurred there were few indications of poor performance." *Id.* Dean Katz was under the impression that "evaluators were reluctant to report negative things about anyone." *Id.*

As part of the 2005 reorganization, Dean Katz placed IWW, and its director, Moccio, in the Diversity and Inclusion thematic group. Pl.'s 56.1 ¶ 9. Dean Katz moved IWW to that group because he "'thought that the Institute for Women and Work and [Moccio's] activities were most closely connected to [the] Diversity and Inclusion theme.'" *Id.* ¶ 9 (quoting Deposition of Harry C. Katz ("Katz Dep."), Marek Aff. Ex. 2, at 72). As a part of this reorganization, IWW would no longer be a "free-standing sub-unit in Extension," and Moccio would no longer report directly to the dean. Katz Aff. ¶ 10. Instead, she was to begin reporting directly to the new Diversity and Inclusion group leader, Christopher Metzler. Pl.'s 56.1 ¶ 9.

In or around September 2005, upon learning of this decision, Moccio asked if she and IWW could remain a free-standing entity, not assigned to any of the new thematic groups. Pl.'s 56.1 ¶ 10. Dean Katz denied that request, on the ground that it would perpetuate the "'high fragmentation of programming and coordination'" that he perceived in the Extension Division. *Id.* (quoting Katz Dep. at 72–73).

On or around October 4, 2005, Metzler met with Moccio to discuss the new organization. After the meeting, Metzler called Cathy Mooney, the Executive Director of Extension for ILR. Metzler complained that Moccio displayed "open hostility." Defs.' 56.1 Ex. 3; Mooney Aff. ¶ 4.[2] Mooney later reported to Deans Katz and Bruyere that Metzler had "adjourned the meeting

---

[2] Cathy Mooney was Executive Director of Extension at ILR until June 2009. Mooney Aff. ¶ 1. Mooney's responsibilities in that role were to oversee administrative support for the academic staff in Extension. She was also responsible for helping implement the reorganization of the ILR Extension put into place by Dean Katz in 2005.

because of Francine's hostility and his inability to move forward in the discussion with her."
Defs.' 56.1 Ex. 3; Mooney Aff. ¶ 4.  Moccio, for her part, later described Metzler's behavior at
the meeting as "very uncollegial, professionally inappropriate and insulting."  Defs.' 56.1 Ex. 4.
Moccio stated that she found Metzler to have a "big boss mentality," and that he had been
"trying to throw [his] weight around"; she explained to Mooney that "[i]t's not going to work if
this is the posture that these program leader folks are taking."  Defs.' 56.1 Ex. 4.

Around the same time, Moccio asked that she be given a tenured faculty position.  Katz
Aff. ¶ 12.  Dean Katz informed Moccio that, under University policy, there were "no tenure track
faculty appointments in the Extension Division."  Defs.' 56.1 Ex. 5.  He explained that tenure-
track positions were periodically announced in the Resident Division of ILR, and that when such
positions become available, the school conducts "internationally advertised searches" to fill those
positions.  *Id.*  Additionally, Resident Division "faculty appointments require teaching in the
undergraduate and graduate programs on the Ithaca campus and the conduct of research."  *Id.*
Dean Katz also explained that Cornell had created "a limited number of non-tenure track
professorial appointments," that appointments to such "clinical" professorships are made by the
Provost for renewable five-year terms, and that as of October 2005, the only person to hold a
clinical professor position at the ILR School was Dean Bruyere.  Defs.' 56.1 Ex. 5.  Moccio
asked Dean Katz to review her experience, because she believed that her record was strong
enough to compete in such a process.  Katz. Aff. ¶ 12.  On October 8, 2005, after receiving
Moccio's resume and qualifications, Dean Katz informed her, by email, that, in his view, she did
not have adequate qualifications to "meet[] the standard the Provost has been using for a clinical
professor appointment."  *Id.*  Dean Katz also offered to "provide further clarification of the
nature of [Resident Division tenure-track] faculty positions, the standards used to evaluate

[7]

candidates, and [his] assessment of [Moccio's] record." *Id.* Moccio did not respond to Dean

Katz's October 8, 2005 email, nor did she raise the subject again. *Id.* ¶ 12; Defs.' 56.1 Ex. 5.

In an October 12, 2005, email to Moccio, Dean Bruyere requested that Moccio

"meaningfully integrate" into the new structure of the ILR School. Dean Bruyere explained that

"the diversity and inclusion area seems like the natural fit" for IWW. Defs.' 56.1 Ex. 6.

At the same time, Dean Katz and Ron Seeber, the Vice Provost for Statutory Affairs at

Cornell, discussed the possibility of moving IWW, and thus Moccio, out of the ILR School

altogether, thereby granting her requests to not be placed in the Diversity and Inclusion group

and responding to her misgivings about the new ILR organizational structure. Defs.' 56.1 Ex. 7;

Katz Aff. ¶ 14. Under that approach, financial support from the state legislature would have

been directed to Moccio, not Cornell. This alternative was not pursued. Defs.' 56.1 ¶ 25.[3]

In an October 31, 2005 email to Moccio, Dean Bruyere stated:

> I am following up on your . . . suggestion of an alternate configuration for the
> organizational structure for the Institute, and women and work programming. We
> continue to see the diversity umbrella as the broadest overarching theme for a
> variety of programming, including that of the area of women and work. . . . . We
> also want our faculty to being to work more collaboratively as a team, rather than
> independent consultants or contractors . . . . Chris [Metzler] will therefore be
> calling regular meetings that you will be expected to attend, asking for budget
> information to look at the overall financial health of the area that he will be
> responsible for, and also doing goal setting and performance management with
> the group and individual members. . . .

---

[3] Moccio denies that the alternative was ever discussed with her. Pl.'s 56.1 at 50 (responding to Defs.' 56.1 ¶ 25) (denying assertion that Deans Katz and Bruyere decided not to pursue this option because Moccio was not interested in leaving Cornell; Moccio stated that "no one ever discussed this option with Plaintiff") (citing Moccio Aff. ¶ 10). However, in an October 10, 2006 email to Fleron explaining the conflict that had arisen during the Extension Division reorganization, Moccio stated: "Harry Katz personally told me . . . that if I didn't like the Diversity and Inclusion group, the IWW would stay under Mr. Meltzer and I could take my funding and leave the University at the end of June 2006." Defs.' 56.1 Ex. 39. Accordingly, the Court finds that Moccio was, at least to some degree, alerted to a possible outcome under which she would receive state funding independent of IWW.

Defs.' 56.1 Ex. 9.

On November 3, 2005, Moccio met with Deans Katz and Bruyere to discuss Moccio's complaints about the placement of IWW within the Diversity group.  Katz Aff. ¶ 18.  Dean Katz attests that at the meeting, Moccio "aggressively and repeatedly yelled" at him; he describes the interaction as "bizarre and embarrassing, having occurred in an open public space [at the Cornell Club in New York City] where others were dining as well."  Katz Aff. ¶ 18.  Dean Bruyere similarly attests that Moccio "was very visibly upset" and "inappropriately very verbally loud in a public setting."  Bruyere Aff. ¶ 3.  Moccio, by contrast, attests that she never yelled, but was upset when "told [she] either had to remain in the Diversity Group under the leadership of Metzler, with whom Dean Katz knew [she] had a tense relationship [], or leave Cornell." Moccio Aff. ¶ 13.

> In a November 5, 2005 email to Moccio, Dean Bruyere stated:
>
> This comes as a follow-up to our breakfast meeting on Thursday . . . We continue to feel that it is important for each individual professional, project, or institute to fit within the broader scheme of topics, and therefore, want you to imbed your work within the diversity area.  We see the IWW being set within the context of this larger effort as a way to better position you and this work to garner new work and funding from outside agencies.  As we confirmed, this does not mean that the [IWW] will lose its identity, and certainly can remain a discrete entity within the larger group. . . . [Y]ou will continue to serve as the IWW Director and be the Principal Investigator/Project Director for the funding that you secure.
>
> In this organizational structure you will report to the Thematic Area Lead, Chris Metzler, and will begin dialogues with Chris about goal setting for the coming year and beyond.

Defs.' 56.1 Ex. 11.

In a November 6, 2005 email to Vice Provost Seeber, Dean Katz attached the text from Dean Bruyere's October 31 email to Moccio, stating:  "As you will see from below, we are not eliminating Francine's role as IWW director, just making her report to someone other than the

[9]

Dean and participate in a thematic group.  She doesn't seem to grasp or want to accept that."  Defs.' 56.1 Ex. 12.[4]

In a November 7, 2005 email to Deans Katz and Bruyere, Moccio wrote: "What have I done and the Institute done to provoke you to do this without even any word of discussion or consultation . . . .  I hope that this action you're taking will provide some great benefit to you because it certainly will deprive working women of access to their workplace rights."  Defs.' 56.1 Ex. 8.

After the November 3, 2005 meeting, Dean Katz told the ILR Human Resources Director, Lisa Abbott, of his communications with Moccio.  Deans Katz and Bruyere asked Abbott to meet with Moccio to "discuss her inappropriate behavior."  Katz Aff. ¶ 19.  Before Abbott met with Moccio, Abbott wrote to Vashti Peagler, a Cornell University human resources staff member:

> I wanted to get your advice with respect to a situation that is evolving in the NYC office.  I know that you have met with Francine [Moccio] in the past and are familiar with her behavior.  She is not responding very well to the recent reorganization of the extension division . . . .  Chris [Meltzer] and Francine attempted to have a meeting about two weeks ago that was disastrous.  Susanne [Bruyere] has asked me to facilitate the meeting she is asking Francine to participate in, with Chris and Harry [Katz].  Assuming she actually shows up, do you have any suggestions in terms of how to guide the meeting such that it doesn't turn into another disaster?

Defs.' 56.1 Ex. 11.  The "tense relationship" between Moccio and Metzler continued.  Moccio Aff. ¶ 13; Katz Aff. ¶ 21.  Dean Katz did not receive any similar complaints about Metzler's management style from any other professional who reported to him.  Katz Aff. ¶ 21.  Dean Katz

---

[4] Dean Katz explains that he sent that email because he had reason to believe that Moccio had shared her discontent about the new organization in the Extension Division with New York State Assemblywoman Susan John, who was Moccio's and IWW's source of funding in the state legislature.  Katz Aff. ¶ 20.  Moccio denies ever telling Assemblywoman John of her discontent with the reorganization.  Moccio Aff. ¶ 14.

concluded that Metzler was "doing his absolute best to manage an employee who refused to be

managed." *Id.*

In a November 22, 2005 email responding to an earlier email from Moccio, Metzler

stated:

> This e-mail is part of the pattern of behavior that you have exhibited since you
> have been told that you are reporting to me. That behavior is one of utter
> disrespect and contempt. In addition, it is symmetrical with your pattern of
> consistently misstating events and raising baseless allegations that you are being
> somehow singled out. . . . I am asking for a schedule from you and everyone on
> the team . . . . in the spirit of team work. So, your day laborer analogy is not only
> inaccurate, it is offensive and it is simply not based in fact. . . . Your allegations
> that I would somehow do something to destroy the quality of the Cornell offerings
> is without merit and baseless. Once again, it is an analogy that seeks to denigrate
> my leadership and buttress your baseless allegations . . . . You are not being
> treated differently from anyone else. My request for information was sent to the
> entire team, not just to you. . . . [S]ince the start of your reporting relationship to
> me, you have been consistently rude, impolite, and disrespectful. . . . You are
> certainly welcome to disagree with my management style and to offer
> "constructive criticism." As a doctrinal matter constructive criticism is devoid of
> vitriol, and not offered as thinly veiled threats and as a substitute for a covert
> agenda.

Defs.' 56.1 Ex. 13.

Dean Katz then determined to move Moccio and IWW from the Diversity and Inclusion

group (under Metzler's leadership) to the Workforce Industry and Economic Development

("WIED") group, under the leadership of Lou Jean Fleron. In a November 25, 2005 email to

Dean Bruyere, Abbott, and Mooney, Dean Katz explained his change of course. Defs.' 56.1 ¶

43; *id.* Exs. 17, 18. WIED, he noted, focused on workforce development, a subject related to

Moccio's focus on promoting women's access to higher-level professional opportunities. Dean

Katz wrote:

> [T]he relationship between Francine and Chris has reached the point of no return.
> I also worry that Chris will get further distracted dealing with Francine and
> possibly discouraged. Also, I don't see that it would be either fair or, helpful to
> future dealings with Francine, to deny her the option of transferring to a different

> thematic group. . . . So I am led to the view that we should allow Francine and the IWW to be shifted to WIED . . . . I think Lou Jean has the experience and backbone to deal with Francine.

Defs.' 56.1 Ex. 14.[5]

In a November 28, 2005 email to Dean Katz, Moccio stated:  "I am writing to request that tomorrow's meeting be postponed . . . . because of the tremendous discomfort and stress I feel due to the severe hostile work environment and retaliatory environment that has been created." Defs.' 56.1 Ex. 15.  That same day, Dean Katz responded to Moccio, proposing that she and IWW be relocated in the WIED group under Fleron's leadership.  Moccio responded:

---

[5] Moccio claims that, in fact, Dean Katz changed course as to the most suitable thematic group for IWW because a New York State legislator pressured him to make the change.  Pl.'s 56.1 ¶ 12 (citing Deposition of Joseph Grasso ("Grasso Dep."), Marek Aff. Ex. 5) ("I remember the historical account of Francine where there was some issue in the New York City office of something and one of the legislators—this preceded my time—one of the legislators called President Skorton [of Cornell University] to say, gee, Francine should report to somebody else rather than to X.  So that the legislator, Francine's patron, called President Skorton and President Skorton intervened, which is the most unusual thing.  And that is why I view, when I talk about Francine, we have to be careful or whatever, it is part of that calculus of her ability to use her power in an abusive way.").  Grasso, however, is not a percipient witness to these events.  His employment at Cornell and the ILR School began in July 2007, more than 18 months after the incident in question, and his testimony is based on his recollection of a statement made to him long after the fact.  Grasso's account is, further, contradicted by the testimony of Moccio herself.  She testified that, contrary to Dean Katz's suspicion, she "never at any time shared [her] discontent at any point about the new reorganization in ILR Extension with Assemblywoman Susan John ([her] funding source)."  Moccio Aff. ¶ 14.  In addition, Mooney, who joined the ILR School in 1972 and knew Moccio for her entire tenure at the ILR School, testified that an incident involving intervention by the state legislator with the president of Cornell on Moccio's behalf did occur, but before Katz became dean, and that it related to Moccio's discontent with a prior supervisor.  Mooney Aff. ¶¶ 1, 3, 15; *id.* ¶ 15 ("One unique aspect of Dr. Moccio's employment was that over the years, she received her NYS funding based on support from a single assemblyperson.  I never quite understood the connection, but I did know that over the years, the ILR administration was very careful about taking any action that would offend Dr. Moccio, because if they did do, they would hear about it from the legislator.  I do recall an instance, years ago, before Harry Katz became dean, when Dr. Moccio was complaining about her supervisor.  Apparently she voiced her complaint to the legislator, who in turn contacted the Cornell president.").  It is, accordingly, overwhelmingly likely that the incident of which Grasso learned second hand occurred prior to the period relevant to this case.

> I've thought about your offer and I would like to ask if you would consider and accept some conditions . . . . I am requesting to report to the Associate Dean of Outreach as well [as Ms. Fleron]. . . . [T]he IWW unlike any other programs in extension always reported to either the Associate Dean or ILR Dean.  There are times when the grants we receive have to do not only with income, but with individuals that Cornell values as prestigious . . . .

Defs.' 56.1 Ex. 16.  Dean Katz responded:

> I do not see the need for you to simultaneously directly report to the Associate Dean.  The special prestigious appointments and other matters you describe can be accommodated within the thematic group structure, and furthermore, similar issues may arise for other Centers and Institutes and thus a special reporting relationship for you would undermine the purpose of thematic groups. . . . Direct reporting relationships are not being provided to any individual extension faculty.

*Id.*  Moccio responded:

> [I] accept your offer after much thought as I believe [Ms. Fleron] has no intention, lik[e] Mr. Metzler to push me out of my job in light of his continuation of a hostile work environment.  But with all due respect, the fact that IWW has reported to local level folks, and to the Associate Dean and ILR Dean has never interfered with encouraging resident and extension faculty interaction . . . . With all due respect, I don't see the logic in this especially since the IWW has always had this special relationship and for very sound reasons.  Be that as it may, I would like to accept your offer to transfer and begin to try to recover from the damage that has been done . . . due to these terrible three months of harassment. . . . I am still apprehensive that the harassment may start all over again but hope this is just . . . an unwarranted fear.

*Id.*

After resolution of the dispute relating to the placement of IWW and Moccio, Cornell personnel continued to consider alternative means of addressing the workplace tension involving Moccio.  In a December 13, 2005 email, Peagler, the Cornell human resources staffer, wrote to Abbott, the ILR human resources director, discussing the need to involve other Cornell personnel to discuss "concerns about Francine's recent behavior" and "the matter of her having stated repeatedly, in writing (and orally?), that she was being harassed."  Defs.' 56.1 Ex. 20.  In her December 14, 2005 response to Peagler, Abbott reported: "This situation continues to unfold –

[13]

more insubordinate behavior.  Harry [Katz] and I met this morning and we are in agreement that there will be . . . a conversation between Francine and myself."  *Id.*

### D.  The Request that Moccio Sign a Flexplace Agreement

On January 6, 2006, Fleron, the head of the WIED thematic group in which IWW and Moccio had been placed, asked Moccio to fill out a flexplace agreement, an agreement that employees whose work was not primarily in the office were expected to complete pursuant to Cornell University policies.  Defs.' 56.1 ¶ 49; *id.* Ex. 23; Pl.'s 56.1 at 60 (admitting to Defs.' 56.1 ¶ 49).  Fleron wrote: "I forgot to mention one other thing that we are going to need to do in the fairly near future.  We need to draw up a flexwork agreement for you.  The administration is requiring those for anyone who's [sic] work is not regularly in the office."  Defs.' 56.1 Ex. 22.

On January 16, 2006, Moccio responded to Fleron's request:

> I have no problem filling out a Work-Flex agreement but first please send me the attendance list of the faculty in the 34th street office, and campus-wide regarding when they regularly or virtually do their work either specifically sitting at their desks . . . . please also list the names of faculty in extension who are being asked to fill out a Work-Flex agreement as part of this new reorganization. . . . I really do need to know who is spreading the rumor regarding my attendance at work.

Defs.' 56.1 Ex. 23.  Fleron responded, on the same date:

> As I explained to you on the phone today, I discussed with Lisa Abbott the importance of universal and equitable application of the new policy on flexplace agreements, and I am confident that the policy will be fairly applied.  I am forwarding your concerns to Lisa as well and in the next email I'll forward to you the communication that she sent to all the thematic leads.  That communication states the general policy and includes a link to the university policy which you may also read.
>
> I'm really hoping, Francine, that we can avoid any suggestion that "allegations" have been made against you, as that is simply not the case.  You are not the only one of the WIED group that, as a simple matter of fact, works from out of the office some part of the time on a regular basis.  We need to be sure that whatever such work arrangements . . . be consistent with the university policy.  You may be sure that I will be applying the flexplace policy evenly and fairly to everyone in our unit.

[14]

Defs.' 56.1 Ex. 23.  A meeting between Moccio and Abbott was scheduled to be held on or

around January 17, 2006.  Moccio wrote to Abbott, the ILR human resources director, directly.

> I would like to know what criteria you have used in selecting certain faculty at
> this point in time to review these informal agreements with?  And the list of
> faculty around the State that have been asked to have their workplace flexibility
> agreements reviewed during this reorganization?  Please forward me this
> information. . . . for the purpose of judging whether my workplace flexibility
> patterns are atypical. . . . When I was hired at the ILR Extension Division, I
> understood that this was a professional faculty position with workplace flexibility
> built in so that it would be possible to fulfill the requirements of the job . . . . I
> would now like to know if my terms and conditions of my job have changed?  Is
> it a support staff position with responsibilities to be at a desk from 9 a.m. to 5
> p.m.?

Defs.' 56.1 Ex. 25; *see also* Pl.'s 56.1 at 61.

Abbott drafted a document to guide her conversation with Moccio at their scheduled

meeting.  Items that Abbott intended to discuss were instances of Moccio's "[i]nappropriate

behavior," including the "[i]ncident at Cornell clu[b] in November" at the meeting with Dean

Katz and Dean Bruyere, "missed meeting w/Dean," "[l]ate to WIED group meeting," "[o]utburst

during WIED group meeting—overtly poor behavior," and "[n]ot providing information to the

Dean as requested repeatedly."  Defs.' 56.1 Ex. 26.  Abbott's notes also stated:

> While each of these situations in and of itself does not rise to the level of formal
> policy violations, the pattern is there.  I seek to understand why your tone is
> consistently so strong. . . . The tone of your responses to e-mail correspondence,
> and some of your demonstrative behavior is disrespectful, borderline
> insubordinate, and certainly making me uncomfortable. . . . You are certainly free
> to express your opinions and ideas, but again, your tone is harsh and extreme and
> I'd like for us to strategize about ways you can get your point across without
> being insolent.

*Id.*  After Moccio's request to reschedule the meeting, a conversation between the two was held

on February 9, 2006.  Abbott's notes reflect that they "spent some time discussing Francine's

feelings of being harassed."  *Id.*  Moccio cited several examples to Abbott, including the

"reorganization of her work group back in September," "the decision to have the IWW fall under

the purview of the Diversity group," and the "review of Francine's work book on the IWW, which she perceived as an impromptu performance review."  Defs.' 56.1 Ex. 26.

### E.  The 2006 Request that Moccio Move Offices

In early February 2006, Mooney, Executive Director of the Extension Division, decided to relocate the office of Moccio's administrative assistant, Jo-Ann Perkins.  Defs.' 56.1 ¶ 68; Pl.'s 56.1 at 66; Mooney Aff. ¶ 6.  Ed Acevedo, the Extension Division Deputy Metropolitan Director, explained in an email message on February 7, 2006:  "Jo-Ann is being moved out of the office by the end of the week.  I will talk to you about where we will move the IWW files intact as you had requested and to find the cubicle for your interns with the computer installed, etc."  Defs.' 56.1 Ex. 28.  In response, Moccio sent an email to Acevedo, copying Mooney:

> [W]hen there are other extension programs in this office that have two offices and have less seniority that the IWW, and do not bring in the income we bring, why is the IWW's 2nd office being singled out to be thrown out and used for some other program? . . . Also you should have secured the cubicle first so that I could put my work and papers . . . . I have to pack boxes and lift things in order to secure my files, and not disrupt the continuity of the IWW's work, and I'm five months pregnant.  I think this is a really terrible thing you are doing.

Defs.' 56.1 Ex. 28.  Acevedo responded:

> [S]upport personnel are provided with cubicles before any space is provided for interns and students.  A program's seniority or longevity is not used as a factor to determine the number of offices a program is to occupy.  The IWW is not being singled out and I am sorry that you are feeling that it is. . . . Please note that I am arranging to have persons other than you and/or Jo-Ann move the file cabinets and boxes of materials.  I have not asked you or Jo-Ann to make any moves by yourselves . . . . We hope to make this move with minimal or no disruption to the flow of work for IWW.

*Id.*  Moccio responded:

> I do not know what you are trying to deny here but . . . I do not accept your re-edited version here. . . . You threw her [Jo-Ann] out and my program.  The IWW program has occupied that office for 17 years now and has used it thoroughly. You never even asked me if I needed it, you have just written to me singling me and my program out to get out of the office by the end of the week, and threw my

[16]

secretary out on a minute's notices.  The rest of your explanation and attempt to rationalize your actions is totally unacceptable to me.  This is harassment of a very basic nature.

*Id.*  Mooney and Alvarez agreed not to respond to this message.  *Id.*  Mooney forwarded the interaction to Deans Katz and Bruyere, and to Abbott.  *Id.*

On February 9, 2006, Moccio spoke with Abbott about the move.  Abbott sent an email to Mooney to document prior email correspondence and the contents of her conversation with Moccio.  Abbott represented that she had explained to Moccio that the Extension Division "needed to make room for new staff and that other offices would also be moved over the next few months."  Defs.' 56.1 Ex. 29.  Abbott stated that Moccio had stated that Abbott's approval of the move was "disrespectful," and that Moccio "hop[ed] that [Abbott] wouldn't be able to sleep at night because of what [she] had done."  *Id.*  After that exchange, on February 10, 2006, Mooney emailed Moccio about the office move:

Let me be very clear about exactly what is going to happen today.

JoAnn Perkins has been moved to the cubicle diagonally across the corridor from her former private office. All of JoAnn's personal files, computer and supplies were moved with her.

We've identified a cubicle, directly across from your office, that will be assigned to your intern.  The intern can remain in this space until we need to space for a permanent office staff.  If that happens, we will identify alternative space for the intern. . . .

All the materials from the bookshelves are packed in boxes and will be placed in locked storage until you tell us if you want them place[d] on shelves in the intern cubicle, or elsewhere.

Ed is anxious to have a conversation with you about where you would like the books and supplies located.  As soon as you are ready to have that conversation, we will move the stored materials and unpack the boxes.

*Id.*

On April 6, 2012, after several email messages between Moccio and Fleron regarding the integration of IWW with the WIED group, Dean Bruyere instructed Fleron to copy Abbott on all

communications with Moccio, because the ILR School was "building a file on the situation."

Defs.' 56.1 Ex. 31.

### F. Budget Concerns and Workforce Reductions in 2006

On June 27, 2006, Fleron sent an email to the faculty in the WIED group about budgetary

shortfalls in the Extension Division.

> As a follow-up to the message you just received about the financial situation of the Extension Division, I want to let you know that I will be talking with each of you about ideas you have for expense reduction and revenue growth for our unit. This deficit situation spotlights our need to generate contracts, grants, programs and projects as quickly as possible and to be ever more mindful of the most effective utilization of our resources.

Defs.' 56.1 Ex. 35.  During the ensuing months, Fleron and Moccio communicated multiple

times about the budget of the WIED group and IWW.  In an October 16, 2006 email in response

to an earlier message from Moccio, Fleron stated:

> As it seems now clear, IWW has, exactly as we had indicated on the preliminary budget information provided [to] you as a part of our WIED budgeting process, $100k from the state of New York for 2006-07. . . . $100k is not enough to sustain the institute's activities, and, exactly as all ILR extension units, IWW will need to have a *budget target* and *specific plan* for securing additional funding to work toward sustainability. . . . I proposed [a $60k income goal] to you (as part of our regular WIED planning process) at our WIED meeting in NYC on February 23, 2006.  Each WIED team member responsible for a budget area was to revise that information . . . . [t]his information has been communicated to the WIED team in several subsequent email updates, the last of which I just reforwarded to you last Thursday.

Defs.' 56.1 Ex. 38 (emphasis in original).  Fleron added:

> I am asking of you NO MORE AND NO LESS that I am asking of all WIED team members and that is to provide us adequate information on budget projections in order to do responsible resource planning. . . . Given the terrible storm and state of emergency here, we are just now finishing up the revised budgets for WIED, so if you could send me that information today, that would be great.  It was originally due on [October] 12th.

*Id.* (emphasis in original).

[18]

In the fall of 2006, Dean Katz decided to end the entire Diversity and Inclusion thematic group. Katz Aff. ¶ 35. As part of this workforce reduction, six faculty members were terminated. *See* Oral Arg. Tr. 10 (Apr. 17, 2012) (Dkt. 79). Following the layoffs, the Extension Division team structure was reorganized into five (rather than the original eight) thematic groups. Bruyere Aff. ¶ 12.

### G.  2006 and 2007 Salary Increase and Reappointment

In a June 15, 2006 letter, Fleron informed Moccio that she would receive a salary increase for the following year reflecting a 2% cost of living adjustment. Defs.' 56.1 Ex. 32. The 2% increase, determined by Deans Katz and Bruyere, represented a lower than average pay increase. Defs.' 56.1 ¶ 76; Katz Aff. ¶ 32. The letter explained that the 2% increase "reflect[s] some areas requiring improvement in your overall performance." Defs.' 56.1 Ex. 32. After Moccio inquired why her pay increase was "below the norm and apparently punitive," Fleron explained that the 2% increase (rather than the maximum 3%) "reflected the initial difficulties you [Moccio] had in adjusting to the recommendations for the new thematic structure, rejecting the dean's first recommendation for your affiliation." Defs.' 56.1 Exs. 33, 39. Fleron explained that the 2% increase also "took into account some delays and postponements in completing your [Moccio's] planned work." Defs.' 56.1 Ex. 39.

In response, Moccio requested that Fleron provide her "with a breakdown of the wage scales in ILR Extension among Senior Extension Associates including male and female." *Id.* Moccio also stated that "it was [her] understanding that Dean Katz's first assignment for all senior extension [associates] was a recommendation and that [they] had a choice as to whether to accept the assignment, or request a transfer to another thematic area." *Id.* She added that "Mr.

Meltzer continued to harass and harangue me to the point that I had no recourse but to request a transfer to another thematic area." *Id.*

In a letter dated March 21, 2007, Dean Katz extended Moccio's appointment as SEA for the period April 1, 2007 through March 31, 2012. Defs.' 56.1 Ex. 40. In that letter, he stated: "All appointments are contingent upon available funding, satisfactory performance and available work." *Id.*

In a June 11, 2007 letter, Fleron informed Moccio that she would receive a salary increase reflecting a 3.5% performance-based merit award. Defs.' 56.1 Ex. 41. Fleron stated that the ILR School's "preeminent standing was confirmed in the positive feedback we received this spring from the External Review Committee," and thanked Moccio for her service.

**H. The 2007 Budget Shortfall**

In late December 2007, Dean Katz considered an additional reduction in force in the ILR Extension Division. Defs.' 56.1 ¶ 89; *id.* Ex. 43; Katz Aff. ¶ 39.[6] An agenda for a December 7, 2007 ILR Extension budget meeting involving, among others, Deans Katz and Bruyere, Grasso, and Mooney, broadly describes the financial state of three thematic groups: the WIED group, the Labor and Employment Law group, and the Labor and Unions group. Defs.' 56.1 Ex. 43. The agenda describes "structural deficits that will continue to worsen unless new revenues are secured or expenses significantly reduced," including "a $300,000 - $500,000 budgeted and/or

---

[6] Moccio disputes this fact, asserting: "As of August 28, 2008, no personnel cuts were planned by President Skorton." Pl.'s 56.1 at 74. The Court cannot credit Moccio's denial, because (1) her conclusory denial of defendants' factual assertion, sworn to by Dean Katz, is unsupported by testimonial or documentary evidence; (2) Moccio's independent assertion relating to Cornell University President Skorton's plans presents a separate issue, which is outside the scope of Defs.' 56.1 ¶ 89; and (3) the exhibit Moccio cites to support her assertion relating to President Skorton, Defs.' 56.1 Exhibit 44, is inapposite: It is a series of emails relating to the new lobbyist registration policy, not the budget.

projected loss for these programs." *Id.* at 2.  The agenda poses the question: "Should we begin to

reduce expenses?  When would we trigger another layoff or not filling positions?" *Id.*

### I.   The Request that Moccio Register as a Lobbyist

On December 13, 2007, Deans Katz and Bruyere alerted the ILR School staff to new

state statutory registration requirements for persons who interact regularly with lawmakers.

Dean Bruyere explained:

> New York State recently amended its Lobbying Act and these changes affect how
> Cornell University Government Relations reports lobbying activity to the State.  It
> is very important that you become familiar with these changes.  Attached is a
> document . . . that details what activities are considered to be lobbying, what is
> not considered lobbying, and the new requirements regarding gifts to public
> officials. . . . It is now necessary for those of you who lobby to fill out a report
> (attached) and return it to the Dean's Office every two months.

Defs.' 56.1 Ex. 44.  The deadline to complete the report was set for December 20, 2007.

In a January 4, 2008 email to Deans Katz and Bruyere, and Fleron, Moccio sought

guidance regarding an email she had received from the Office of Government Relations, asking

her to submit her completed form to register as a lobbyist.  Moccio stated:

> Steve Johnson from the Office of Government Relations emailed me over a month
> ago [saying] that Dean Katz and he discussed and agreed to now list me as a
> lobbyist based on the fact that the IWW has received state funding. In addition,
> Steve told me that as director of the IWW, I would now have new additional
> reporting responsibilities.  He also sent me a list of others at Cornell whom he has
> also listed as lobbyists.  I have related to him that I do not consider myself a
> lobbyist; and have asked him what specific aspects of the new regulations
> influenced his and Dean Katz's decision to list me as such.

Defs.' 56.1 Ex. 44.  In an earlier email message to Dean Katz, Johnson had told Dean Katz that

the "best option" would be for him to "tell her [Moccio] that as the lead on [IWW], she has a

responsibility to advocate for her program, including interactions such as developing the budget

request, discussing with Assemblywoman Cathy Nolan and her staff . . . . I will need her to

report her time."  Defs.' 56.1 Ex. 42.

The same day, Fleron responded to Moccio's email inquiry. Fleron explained that "the new state law requires anyone who talks with state officials with the intention of securing any advantage for Cornell University must register as a lobbyist." *Id.* She also pointed out: "[C]learly you and I will both need to be registered. . . . and I don't think it will be a very onerous task to report it." *Id.* Dean Bruyere separately responded to Moccio. She explained: "It's my understanding that anyone who speaks to legislators about possible funding for their projects/programs and those exchanges result in funding are now considered lobbyists. We therefore submitted a list of people we thought might qualify under this description based on their state supported projects. I believe your name was among those submitted." Defs.' 56.1 Ex. 45.

> On January 6, 2008, Moccio responded to Dean Bruyere:
>
> I'm a little confused about the procedure that has been followed because in early November, Steve Johnson informed me that it was Dean Katz who recommended that I be listed as a lobbyist. Finally, I understand that my colleagues in the New York City office who receive similar state funding as I do, have not been listed as lobbyists. Do you know if this is accurate?

Defs.' 56.1 Ex. 46. Dean Bruyere responded the following day:

> I don't have this list and even if I did, I am not sure if it would be appropriately shared broadly. I can tell you that any of us who are recipients of state funds and Thematic Leads who do outreach for state funds on behalf of their programs are candidates to be on it.

*Id.* Moccio responded:

> My concern is that by being identified as a lobbyist, I will be deprived of the support I had received in the past . . . and be placed in a disadvantageous position vis-à-vis other colleagues who apply for overlapping funding. . . . If the University is unwilling to provide me with the list of colleagues from ILR who are listed as lobbyists, I have strong reasons to believe that I am being singled out, and I wish to grieve Dean Katz's and your decision to be classified as a lobbyist.

Defs.' 56.1 Ex. 47.

On January 9, 2008, Moccio informed Paula Wisteria, a member of the human resources staff, that she was grieving the requirement to register as a lobbyist.  Moccio wrote:  "I do not consider myself a lobbyist, and believe that I have, as in the past, been singled out by the ILR Dean, and the University with regard to designating me as a lobbyist."  Defs.' 56.1 Ex. 49.

### J.   Moccio's Claim of Unequal Pay Among Faculty and Staff

The day after Moccio's exchange with Dean Bruyere regarding registration as a lobbyist, Moccio asked that the Extension Division investigate whether there was evidence to support a finding of gender-based unequal pay among the faculty and staff.  In a January 7, 2008 email message to Deans Katz and Bruyere, Moccio stated:

> It has come to my attention from several female colleagues at ILR Extension Division (Outreach) that there might be a significant pay gap based on gender in the Division.  Therefore, as head of the Institute for Women and Work, I am requesting that the ILR School voluntarily review, evaluate, and report on the status of pay equity based on male and female salaries among professional staff and faculty in ILR Extension.  I would be happy to volunteer to assist in this evaluation and review.

Defs.' 56.1 Ex. 48; Pl.'s 56.1 ¶ 29.  On January 8, 2008, Dean Bruyere responded:  "Thank you for bringing your concerns to our attention.  Compensation is routinely reviewed by the HR office.  As I am sure you can appreciate, salary information is a very confidential matter and we will not share full disclosure of this information."  Defs.' 56.1 Ex. 48.

### K.  The 2008 Request that Moccio Move Offices

In January 2008, Mooney decided to alter the use of several offices within the New York City Extension Division office "in order to give three thematic team leads offices that were adjacent to each other."  Mooney Aff. ¶ 8.  Mooney first considered moving Moccio's office to enable this change.  *Id.*  But, in order to "avoid a confrontation" with Moccio, Mooney asked Sean Sweeney to move instead.  *Id.*

[23]

Sally Alvarez, Sweeney's supervisor, objected to the proposal that he be moved.  In a January 16, 2008 email to Acevedo, Alvarez stated: "[I]t's no surprise to me that the illogic and unfairness of moving him rather than Francine has become an issue.  The fact that the organization is unwilling to deal with her is ridiculous, and it's insulting to those of us who work hard and play by the rules."  Defs.' 56.1 Ex. 50.

In a January 28, 2008 email to Mooney, Fleron described a conversation she had that day with Moccio: "I talked with Francine today about the proposal to relocate her office to the alternative space that would also have space for her intern(s) close by.  She was not agreeable to such a move and asked me to put the request in writing."  Defs.' 56.1 Ex. 51.  Fleron added:  "I suggested to her that we were making the request because of overall space needs in the NYC office and in recognition of our continuing accommodation of her wishes, under an implicit flex-place understanding to work principally from home."  In an email that same day to Fleron, Moccio stated:

> I am responding to your phone call today and your statements to me regarding removing me from my current office space which I have been using over the past 14 years.  As in the past, I am very sensitive to the needs of the School and very accommodating.  However, you mentioned to me in very general terms the need for additional space without providing any specifics as to who will be using my office and for what reason.  You also threatened that if I do not adhere to this request, you will end my "implicit flex-place understanding" that I allegedly have with you to work principally from home.  To my knowledge, I never had such an agreement . . . . [Y]our threats to end my flexibility as a professional faculty leave me to conclude that similar to the pattern that has occurred over the past two years, I am once again being singled out for harassment.

Defs.' 56.1 Ex. 51.  In a January 29, 2008 email to Moccio, copying Mooney, Fleron responded:

> I am disappointed that you interpreted my request in the way that you did.  And I want to be sure to make it clear that I was in no way threatening you with anything.  My appeal to you was based on several facts.  One is that I did, in fact, advocate on your behalf with ILR Human Resources Department for an "implicit flex-place understanding" rather than a formal document granting such flexibility.

Defs.' 56.1 Ex. 52.  Shortly thereafter, Mooney sent a separate email to Moccio:

> I am following up on your conversation with Lou Jean [Fleron] with a written request to ask you to consider our plan to move you to a smaller private office with adjacent space for your interns.  As you know, space is extremely limited in New York City. . . . The moves that we are proposing will accomplish two goals: 1) more fully utilize office space by placing faculty who frequently work in the office and convene small group meetings in the larger offices, 2) reduce demand on the 4th floor conference room, making it available for larger group meetings.

Defs.' 56.1 Ex. 52.  Mooney forwarded the correspondence about the office move to Deans Katz and Bruyere, and to Joseph Grasso, the Associate Dean of Finance and Administration, who had joined the ILR staff in August 2007.  Defs.' 56.1 Ex. 52; Grasso Aff. ¶ 1.  Grasso's responsibilities included, *inter alia*, overseeing finance, budgets, and human resources in the Extension Division.

In a January 30, 2008 email to Deans Katz and Bruyere, and Mooney, responding to the correspondence he had been sent, Grasso stated:

> Wow, now I am realizing what folks have to deal with.  If [F]rancine has been like this with every issue that comes up, I don't see how we can work like this.  Is there a point where we can fully evaluate the benefits she brings to Extension versus the costs of dealing with such a truculent, obstinate person? . . . I know she has some connections to legislative folks, but it seems that we should consider cutting our ties with her unless she is programmatically and financially central to our Extension operations. . . . The issue of space assignment is a management prerogative, and we do not need to justify to her why she has to move.  I think her reluctance to move and her opposition to the lobbying policy etc. is tantamount to insubordination.  She continually refuses to comply.

Defs.' 56.1 Ex. 52.

On February 17, 2008, Grasso sent a follow-up message to Deans Katz and Bruyere, Seeber (the Cornell Vice Provost for Statutory Affairs), and Mooney, discussing alternative strategies for managing the conflict with Moccio relating to the office move and her still uncompleted flexible hours agreement.  Grasso stated that one option would be to "provide Francine with a Flexplace agreement and to let her know that [they] would be moving her

office"; however, he noted, this "would likely set off an explosive response." Defs.' 56.1 Ex. 54 at 2. Under this scenario, they would "provide her with yet another difficult performance appraisal," and with regard to her state funding, she "has to cover her salary with grants or training, and if she can't she would be laid off." *Id.* Grasso also noted that Moccio could be "terminated for cause due to disruptive, insubordinate behavior, failure to follow University policies, and failure to generate any additional revenue." *Id.*

Another, less "controversial" option, Grasso stated, would be to arrange for Moccio to receive the IWW funding allotment directly, "allowing her to be a stand alone entity no longer connected to ILR." *Id.* Under such a scenario, the ILR School "could still provide her with employee benefits but arrange for her to be an independent consultant with Extension and not an employee." *Id.* However, Grasso noted, redirecting the funding to Moccio required the approval of the state legislature. He noted that Assemblywoman Nolan, who had helped obtain state funding for Moccio and the IWW and whom he understood to have a strong relationship with Moccio, was no longer on the Labor Committee, and surmised that Nolan's successor on that committee, Assemblywoman Susan John, "may not be as sympathetic to Francine as is Nolan." *Id.*

Grasso went on to explain that when he discussed the situation with Charlie Kruzansky, Cornell's Director of Government Relations, Kruzansky informed him that he thought that, because Deans Katz and Bruyere had a meeting scheduled with Assemblywoman Nolan to discuss the ILR School, "it would be bad timing [] to take action against Francine now because all those Albany meetings might focus on Francine as opposed to other issues that ILR would want to discuss." *Id.* Kruzansky concluded that if they went forward with moving her office and providing her with a flexplace agreement, Moccio "would go directly to [Assemblywoman]

Nolan, who has similar tendencies and reactions as Francine, and that [Assemblywoman Nolan] would likely call the Speaker [of the legislature] who would likely call [President] Skorton." *Id.* Accordingly, Kruzansky suggested that they "hold off" on addressing the conflict with Moccio, recognizing that "some disruptive reaction is bound to occur when [they] deal with Francine, and he said [they would] need to face it at some point." *Id.*

In an email response, Dean Bruyere noted that the idea of redirecting state funds to Moccio directly had been explored "tentatively with Francine two years ago and she was not receptive to the idea." *Id.* at 1.  Grasso responded that "moving forward with the office move and workplace agreement could be fine, but if there are any other actions taken, we might want to wait until after the Legislative Budget season is over so we don't suffer any potential consequences." *Id.*  In response, Seeber stated:  "This long festering sore needs to be dealt with." *Id.*  "However, I would urge that you do nothing until we have a state budget locked in. Then the office changes and whatever else you wish to do." *Id.*  Seeber added that he or Dean Katz "should warn Susan John," the legislator on the Labor Committee, before taking action against Moccio, as he expected that Assemblywoman John would "feel the pressure" from Assemblywoman Nolan.  *Id.*

On April 22, 2008, Mooney requested approval from Deans Katz and Bruyere, and Grasso, "to move forward on moving Francine Moccio from her current office."  Defs.' 56.1 Ex. 56, at 2.  Grasso noted: "I think we need to be prepared to possibly terminate her if her behavior becomes an issue.  She will claim that we are discriminating against her and threaten some type of action.  If we want, we could use her reaction as a cause for termination." *Id.* at 1.  He further asserted that they could "make a very strong case for termination," explaining that "there is ample evidence of insubordinate and irrational behavior" in her file.  *Id.*  He concluded that if

[27]

Moccio were terminated, he, Dean Bruyere, and Mooney should all be involved because they would be "terminating her for long-term behavior."  *Id.* at 2.  However, Mooney disagreed that a for-cause termination could be defended.  She stated:

> I think we would be hard pressed to make a case for termination. . . . [T]here are no negative performance appraisals in her file and we appointed her for a five year term last April. . . . [U]nless she does something really outrageous (or I should say, more outrageous than the behavior we have tolerated over the past few years), I don't see how we can terminate her.

*Id.* at 1.  Dean Bruyere agreed with Mooney.  He advised that Mooney proceed with the office move, but that Moccio not be terminated.  *Id.*

On April 23, 2008, Mooney notified Moccio that her office would be moved on May 7, 2008.  Mooney wrote: "Our plan is to move all of your existing furniture to the new private office.  In preparation for the move we request that you pack any personal items and the contents of your desk top.  Our office staff will pack, move and unpack the book[] shelves and contents of your desk drawers."  Defs.' 56.1 Ex. 56, at 5.  Mooney then emailed Acevedo, asking that his staff "refrain from engaging in chatter and to handle this in the most respectful way possible." *Id.*  She added that "if Francine gets verbally or physically abusive to anyone, you should give her an opportunity to quiet down, and if she doesn't[,] have her removed from the building."  *Id.*

On April 24, 2008, Moccio asked Dean Katz whether he had approved the decision to move her office.  Defs.' 56.1 Ex. 57.  Dean Katz responded:  "Yes, I did, as it serves a sound organizational purpose.  We need to have the three thematic leads in New York City . . . sit more closely together so as to facilitate more substantive interaction between the thematic teams they lead."  *Id.*  Moccio replied:  "I am requesting that you reconsider removing me from my office which I have occupied for over the past 12 years as it is going to be a very painful and personal hardship for me, and a major disruption to the work of the Institute for Women and Work."  *Id.*

[28]

Dean Katz responded: "I will not change the decision for the reasons stated in my previous e-mail." *Id.*

On April 28, 2008, Moccio forwarded the correspondence about her office move to Alan Mittman, the Associate Director of the Office of Workforce Diversity, Equity and Life Quality ("WDELQ"), the office in the ILR School tasked with investigating and passing judgment on claims of discrimination. *See* Deposition of Alan Mittman, Marek Aff. Ex. 4, at 15 ("Mittman Dep."). Moccio recounted:

> I have been told that the Dean is removing me from my current office which I have occupied for the past 12 years to an office which is smaller, of inferior quality and previously occupied by a woman over the age of 50 who was a long term employee and that the Dean fired one year [ago]. . . . Since I only have 7.8% of an administrative assistant there is no one to assist me in reorganizing the files once they are moved, or to organize them into the appropriate boxes with labels as to not cause chaos and disorganization . . . . I view this removal as gender-based harassment on the part of the ILW Dean, and retaliatory.

Defs.' 56.1 Ex. 58. On May 5, 2008, Mooney informed Dean Katz that Moccio had filed a complaint with WDELQ. She stated:

> Francine Moccio has filed a complaint of discrimination (based on gender, age, and family responsibilities) against us related to the upcoming office move. [Mr.] Mittman called to tell me that he will be investigating the complaint. . . . [and] is asking us to delay the move scheduled for this Wednesday, He will conduct an investigation and have a final report to use within two weeks.

Defs.' 56.1 Ex. 60.

On May 31, 2008, WDELQ denied Moccio's challenge to the "decision made by ILR administration, approved by ILR Dean Harry Katz, to relocate her office on the 4th floor . . . to a location on a 4th floor corridor." Defs.' 56.1 Ex. 63, at 1. WDELQ concluded that Moccio had failed to identify "any statements or conduct by ILR administration sufficient to evidence discriminatory behavior or an intention to discriminate." *Id.* at 2. WDELQ's decision explained:

> [T]he investigation does not support Dr. Moccio's allegations that she was
> discriminated against on the basis of her gender or age.  ILR administration has
> articulated legitimate, independent and non-discriminatory business reasons to
> support the decision to move her office and Dr. Moccio has failed to demonstrate
> that these reasons are pretextual or motivated by discrimination based upon
> gender or age.

*Id.* at 11–12.  In the 12-page document detailing the underlying facts and the investigation,

WDELQ observed that the "ILR administration adopted an office usage standard for making this

move and that this basis was first articulated to Dr. Moccio by Ms. Fleron, her supervisor, on or

about January 29, 2008."  *Id.* at 7.  Based on that justification, and the fact that Moccio denied

underutilizing her office space, WDELQ investigated the relative use of office space among the

interested parties.  The decision stated: "All of the witnesses confirmed that Dr. Moccio did not

use the office regularly, some saying she used it as little as a few times a month, but all agreed

that she definitely or at least probably used it less than Mr. Sweeney does."  *Id.*

Moccio appealed the dismissal of her complaint to Cornell's Vice Provost John Siliciano,

and asked that the move be held in abeyance until after the appeal was resolved.  Defs.' 56.1 Ex.

64, at 3.

Around that time, Michael Turkett, the ILR School's Director of Human Resources,

became involved in the conflict.  In a June 4, 2008 email to Mooney, which was later forwarded

to Mary Opperman, the Vice President of Human Resources of Cornell University, he urged that

if Moccio again refused to move, it would be "just cause for termination."  Defs.' 56.1 Ex. 64, at

2.  He stated:

> We see her refusal to move as insubordination and will act accordingly since she
> has chosen to ignore the directive and is impeding the commerce of Cornell.  This
> is forcing us into a situation that disables the efficient operation of the business.
> This action on her part has potential financial ramifications and we will also be
> assessing our legal rights to recover any and all loss of productivity for her
> actions. . . . I think it is appropriate to inform her that the office space is not
> owned by her and is not in her possession but is space paid for by Cornell and

[30]

assigned to employees so they can perform the duties associated with their
re[s]pective jobs. . . . Appeal to a higher authority is fine but at some point, if . . .
the appeal decision is upheld, then we need to take action that could be up to
[and] including termination of employment for A) Insubordination if she refuses
to move 2) Impeding commerce of the university . . . .

*Id.*

On July 16, 2008, Mooney informed Moccio that her office would be moved during the

week of July 28. She then discovered that Moccio would be out of the country until August 23,

and decided, briefly, to hold off. Defs.' 56.1 Ex. 67. However, in light of scheduled office

maintenance affecting the entire fourth floor, and after Moccio's appeal was denied, Mooney and

Grasso agreed to go forward with the move. *Id.* On August 26, 2008, Mooney emailed Moccio

that her office had been packed, moved, and unpacked in consultation with photographs of the

prior office taken by Acevedo. Defs.' 56.1 Ex. 68.

On September 10, 2008, Moccio returned to the office. In an email to Turkett and

Mooney, Acevedo reported that Moccio told a colleague "something like 'they waited until I was

gone from the office, a thousand miles away, to move me…that was brave, wasn't it?...the

cowards.'" Defs.' 56.1 Ex. 71 (ellipses in original). Acevedo added: "I believe that Francine

intended for me to hear the comment as my door was open and she made the comment loud

enough for me to hear." *Id.* Turkett forwarded that report to Dean Bruyere, stating: "This is not

the type of professionalism I would expect from a member of our faculty and does not display

the teamwork behavior of working effectively and cooperatively with others." *Id.*

### L.  The 2008 Budget Shortfall and Moccio's Termination

In February 2008, Dean Katz began to consider specific options for responding to the

expected budgetary shortfall. Defs.' 56.1 ¶ 91; Katz Aff. ¶ 40. A confidential ILR School

budget report, dated February 20, 2008, outlined several major themes of the 2008-09 budget,

including: "reduced and softening revenues due to a no-growth State budget . . . and a weakening economy"; "increased central University costs"; "investments in our physical infrastructure"; and "reductions in underperforming areas or where efficiencies can be gained."  Defs.' 56.1 Ex. 55, at 1.  The report highlighted new approaches to budgeting and possible ways to bring down costs in the coming fiscal year.  In discussing cost-cutting efforts in the Extension Division, the report singled out the WIED group.  It stated that "[t]here could be major reductions in WIED since it has a significant operating deficit, with losses over $500,000 projected for this year."  *Id.*

On May 12, 2008, Grasso sent Dean Katz a confidential document identifying potential ways to respond to the anticipated state budget cuts.  Defs.' 56.1 Ex. 65, at 5.  Of the six cost-saving measures it identified, eliminating the WIED team yielded the largest net savings.  *Id.*  In describing the impact of each potential cost-saving measure, Grasso noted that eliminating the WIED team "would be hard on the employees."  *Id.*  But, he pointed out, eliminating WIED "would greatly improve the cost structure of Extension."  *Id.*

On July 31, 2008, Vice Provost Seeber informed Dean Katz that the Governor of New York had "announced a 7% budget reduction for the agencies under executive control, including SUNY," and estimating that Cornell would thereby lose $9 to $10 million.  Defs.' 56.1 Ex. 65, at 3.  Dean Katz forwarded this information to Dean Bruyere, Mooney, and Grasso, stating: "This sounds worse than Cornell administration's earlier forecasted cuts."  *Id.* at 2.  In response, Grasso outlined a broad plan to reduce overall spending in the ILR School by 10%, "equivalent to about $1,175,000."  *Id.* at 1.  The three major measures he proposed were: (1) eliminating the WIED thematic group (saving an estimated $750,000); (2) downsizing the Labor thematic group or other groups in the Extension Division (saving an estimated $230,000); and (3) general expense reductions of 5% (saving an estimated $250,000).  *Id.*

[32]

On August 12, 2008, Dean Katz sent an email to the ILR School faculty and staff entitled: "Message for ILR faculty and staff regarding the State budget cuts."  Defs.' 56.1 Ex. 66. He stated: "I mentioned in my fiscal report earlier this year that mid-year state cuts might be imposed.  While a significant cut is clearly on its way, final decisions on the size of the mid-year cut have not been made. . . .  I hope to have more specifics to report about the state budget within the next several weeks."  *Id.*

On August 28, 2008, Dean Katz sent a letter to the faculty and staff of the ILR School explaining the financial state of the school.  Defs.' 56.1 Ex. 69.  It stated: "There is positive news to report.  ILR ended the last fiscal year (07-08) with modest surpluses."  *Id.*  However, he stated, "we are facing serious challenges now that will affect future revenues."  First, "[t]wo New York state cuts are likely in the next year.  The first is a mid-year (08-09) cut that is likely to be 10%. . . .  We may also see another 10% cut to our base state funding . . . when the 2010 budget is finalized in spring 2009."  *Id.*  Overall, he concluded, "ILR could see budget reductions up to $2 million, or $2.5 million if you count the $550,000 in foregone revenue from a flat initial budget allocation in fiscal year 2008-09."  *Id.*[7]  He went on:

> The current budget challenge is being addressed in two phases.  The first consists of immediate reductions in department and programmatic budgets, postponing the filling of new positions, and finding administrative efficiencies.  There are no current personnel cuts planned in this first phase. . . . *There will be a second phase that will most likely involve making additional cuts, and these will be more difficult decisions.*

*Id.* at 3 (emphasis added).

---

[7] Dean Katz's letter identified several factors exacerbating the budget shortfall: (1) "ILR has had to contribute an increasing percentage of its revenues to the central university to cover university infrastructure costs. . . . 16% of ILR revenues is paid back to Cornell each year"; and (2) because of the "recession/economic downturn," companies are expected to "cut back on use of outside training," cutting in to "development/training revenues."  Defs.' 56.1 Ex. 69 at 2.

On September 2, 2008, Fleron emailed the faculty in the WIED group, including Moccio, about the state budget cuts.  She stated: "Today we had a Lead's phone meeting on the implications of the state budget cuts for ILR, and as most, if not all of you know, the situation is grim for those extension units with net revenue deficits.  That includes WIED . . . ."  Defs.' 56.1 Ex. 70.

On September 26, 2008, Cornell University President Skorton sent an email message to faculty and staff, including Moccio, to "share some thoughts and information regarding our university at a time of financial volatility."  Defs.' 56.1 Ex. 72.  He stated that "the state's economic situation . . . continues to present substantial challenges for New York, for Cornell, and especially for our contract colleges," of which the ILR School is one.  *Id.*  "The deans of these academic units . . . have the latitude and responsibility necessary to respond to the limitations placed on their programs."  *Id.*

Also on September 26, 2008, Dean Katz sent an email to the ILR School faculty and staff entitled: "Update on ILR School Budget Cuts."  Defs.' 56.1 Ex. 73.  Dean Katz stated that through the "non-personnel programmatic budget cuts" of Phase I, the ILR School had achieved reductions totaling almost $1.1 million.  *Id.* at 1.  He warned, however, that in "Phase II, ILR needs to comprehensively address the budget situation for the long term in anticipation of another 10% drop in state funding for 2009-10 and what will probably be even more state cuts in the future."  *Id.*  He added:

> Extension's financial situation is further complicated by changes in market demand and analysis of where we can provide distinctive contributions and be most competitive while still being true to our mission.  For ILR, the challenge is to grow those areas where the greatest potential exists to advance our mission and generate revenue that helps us offset state funding cuts and relieve other budget pressures.  At the same time, we need to scale back in those areas where market demand has dwindled, with no clear expectation for a major turn-around, and where we have not been able to keep pace.

*Id.*  Accordingly, Dean Katz concluded, the next round of cuts "will require some reductions in workforce in the Extension Division."  *Id.*

On October 28, 2008, Dean Katz announced a reduction in force in the ILR School Extension Division.  Defs.' 56.1 Ex. 75.  As he explained, "the current state of the economy, a significant drop in ILR Extension revenues this year, and uncertainty about the future effects of the economic slowdown have created some urgency for ILR to move ahead with a reduction in workforce."  *Id.* at 1.  As part of this reduction in force, 17 faculty and staff in the Extension Division would be laid off, and an additional eight would be leaving through "retirements and attrition."  *Id.* at 2.  Dean Katz also explained that "[d]ecisions on where to make workforce cuts are based in part on financial sustainability," but they "also looked at other programmatic-based criteria: trends in enrollment and market demands for services; the likelihood of future programmatic impact . . . ; and strong signs of and success developing collaborations with ILR resident faculty as well as other university, government, union and corporate partners."  *Id.*

In a letter dated October 30, 2008, Dean Katz informed Moccio that her appointment as an SEA would be terminated on June 30, 2009.  Defs.' 56.1 Ex. 76.  Dean Katz wrote:  "I regret that our financial circumstances and the resulting programmatic changes necessitates the Extension Division to take a direction that requires this change in staffing."  *Id.*

In a letter dated October 31, 2008, Dean Katz made an announcement to the ILR School with additional details about the reduction in force.  The letter stated:

> We are ending the WIED team, and making some faculty and staff adjustments in the Labor and Unions program . . . . In these tough economic times, ILR has to make difficult decisions to address what has become a multi-year problem and to ensure the long-term financial stability of the school. . . . Progress toward a balanced budget and diversified funding are an expectation for all Extension programs.  ILR made decisions based in part on the ability of Extension programs

over the last several years to become self-supporting through training program
revenues and/or grant and other outside funding support.

Defs.' 56.1 Ex. 77, at 1–2.  He also explained the rationale behind ending the WIED group:

> [F]ormed as a collection of ILR faculty who had created programs and had
> expertise in industry studies and high road economic development, with
> applications to limited areas of workforce development and issues of women and
> work. . . . With a broad mission and new activity priorities set by ILR
> administration, WIED was charged with becoming self-supporting through the
> acquisition of grants and contracts to fund research and outreach projects. . . . It
> was hoped that the WIED team's efforts would generate an even higher level of
> sponsored work and bring them closer to the goal of achieving financial
> sustainability over time. . . . The broad agenda of the WIED group has been one
> that the ILR School as a whole does not have the resources to respond to, and the
> current fiscal situation has made it difficult to achieve financial sustainability to
> the extent and in the time frame that this new reality requires.

*Id.* at 2.  Dean Bruyere "agreed fully with the decision to end the WIED team."  Bruyere

Aff. ¶ 14.

Of the 17 people terminated from the Extension Division in 2008, 14 were faculty, and

eight were active in the WIED team.  Defs.' 56.1 Ex. 75, 90; Oral Arg. Tr. 10; Defs.' 56.1 Ex.

90.  Of the 14 faculty members terminated, 11 were women and 3 were men.  Defs.' 56.1 Ex. 90

at appx. B; Oral Arg. Tr. 10.  Of the 14 faculty members terminated, six (including Moccio) were

SEAs in the WIED team.  Pl.'s 56.1 ¶ 161.  All six SEAs in the WIED team who were

terminated were women.  *Id.*; Defs.' 56.1 Ex. 90.

## II.    Procedural History

On March 16, 2009, Moccio dual-filed a complaint against defendants with the Equal

Employment Opportunity Commission ("EEOC") and the New York State Division of Human

Rights.  Defs.' 56.1 ¶ 201; *id.* Ex. 86; Pl.'s 56.1 at 120.  The complaint alleged that Moccio had

been discriminated and retaliated against on the basis of her gender and age.  On or about July

[36]

27, 2009, at Moccio's request, the EEOC issued a "right to sue" letter.  Defs.' 56.1 Ex. 88; Pl.'s 56.1 at 120 (responding to Defs.' 56.1 ¶ 202).

On April 8, 2009, Moccio filed her Complaint in this action; on April 29, 2009, she filed the First Amended Complaint.  On May 14, 2009, defendants moved to dismiss two of Moccio's claims under New York law: libel (Count 5) and false light (Count 6).  In an Opinion and Order dated July 21, 2009 (Dkt. 15), the Hon. Gerard E. Lynch, to whom this case was then assigned, granted the motion and dismissed those two claims.

On July 30, 2009, Moccio filed the Second Amended Complaint ("SAC") (Dkt. 17).  It alleged 13 causes of action: (1) gender and age discrimination under the NYCHRL § 8-102; (2) gender and age discrimination under the NYSHRL;[8] (3) retaliation under the NYCHRL § 8-107; (4) retaliation under the NYSHRL § 296; (5) libel; (6) false light; (7) breach of contract, relating to the March 21, 2007 letter extending Ms. Moccio's employment from April 1, 2007 through March 31, 2012; (8) violation of the EPA; (9) violation of New York State Equal Pay Law § 194; (10) gender discrimination under Title VII, 42 U.S.C. § 2000e-2(a); (11) retaliation under Title VII; (12) age discrimination under the ADEA; and (13) retaliation under the ADEA.[9]

On August 10, 2009, defendants filed their answer (Dkt. 18).  On October 15, 2011, after extensive documentary and testimonial discovery, discovery closed.  On March 1, 2012,

---

[8] Moccio does not specify under which section of the New York State Human Rights Law she brings this claim.  *See* SAC ¶ 45.  The Court construes this claim as arising under section 296(1)(a).

[9] Not all of these claims survive for purposes of the pending motion for summary judgment.  First, apparently inadvertently, Moccio included the claims for libel and false light in the SAC despite Judge Lynch's having dismissed those claims nine days earlier.  Neither party treats those claims as extant, and the Court regards them as dismissed on the strength of Judge Lynch's decision.  Second, in Moccio's Memorandum of Law in Opposition to Defendants' Motion, Moccio stated that she was "withdraw[ing] with prejudice claims for age discrimination under the federal, state, and city statutes."  Pl.'s Mem. 1 n.1 (Dkt. 70).

defendants moved for summary judgment in their favor on all of Moccio's surviving claims; on April 2, 2012, Moccio filed an opposition to the motion; on April 16, 2012, defendants filed a reply.  Oral argument was held on April 17, 2012.

## III.   Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Where a plaintiff has made allegations of discriminatory retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct

[38]

evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); *see also Chin-McKenzie v. Continuum Health Partners*, No. 10-cv-3658, 2012 WL 2512942, at *6 (S.D.N.Y. June 29, 2012).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  Thus, even in such cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137.

## IV.   Discussion

The following claims remain in this case—for (1) violations of the federal and state equal pay laws; (2) gender discrimination under Title VII, NYSHRL, and NYCHRL; (3) retaliation under Title VII, NYSHRL, and NYCHRL; and (4) breach of contract, relating to the March 21, 2007 reappointment letter.  Defendants move for summary judgment on all of these claims.  The Court addresses each claim in turn.

### A.  Equal Pay Act

Moccio alleges that she was paid substantially less than male colleagues in violation of the EPA and New York equal pay statute.  The EPA provides that:

> No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . .

29 U.S.C. § 206(d)(1).  To prove discrimination in compensation under the EPA, "a plaintiff must show that: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii)

the jobs are performed under similar working conditions.'"  *Lavin–McEleney v. Marist Coll.*, 239

F.3d 476, 480 (2d Cir. 2001) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).

With regard to the "equal work" requirement, "plaintiff need not demonstrate that her job

is identical to a higher paid position, but only must show that the two positions are substantially

equal in skill, effort, and responsibility."  *Lavin–McEleney*, 239 F.3d at 480 (internal quotation

marks omitted).  In determining whether two positions are substantially equal in skill,

"superficial comparisons based on job title or code are insufficient."  *EEOC v. Port Auth. of N.Y.*

*& N.J.*, No. 10-cv-7462, 2012 WL 1758128, at *3 (S.D.N.Y. May 17, 2012); *see* 29 C.F.R. §

1620.13(e) ("Application of the equal pay standard is not dependent on job classifications or

titles but depends on actual job requirements and performance."); *Tomka v. Seiler Corp.*, 66 F.3d

1295, 1310 (2d Cir. 1995) ("[T]he standard under the Equal Pay Act is job content and not job

title or description.").  In "a professional setting such as that of a college,"

> the proper test for establishing a prima facie case . . . is whether the plaintiff is
> receiving lower wages than the average of wages paid to all employees of the
> opposite sex performing substantially equal work and similarly situated with
> respect to any other factors, such as seniority, that affect the wage scale.

*Lavin–McEleney*, 239 F.3d at 482 (quoting *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 (9th

Cir. 1983)).

Once a plaintiff has made such a *prima facie* showing, the burden shifts to the employer

to prove that the pay differential is based on "(i) a seniority system; (ii) a merit system; (iii) a

system which measures earnings by quantity or quality of production; or (iv) a differential based

on any other factor other than sex."  29 U.S.C. § 206(d)(1); *see also Corning Glass Works v.*

*Brennan*, 417 U.S. 188, 196 (1974) (structure and history of EPA suggest that "once the

[plaintiff] has carried his burden . . . , the burden shifts to the employer to show that the

differential is justified under one of the [EPA's] four exceptions").

[40]

The New York equal pay law provides:

> No employee shall be paid a wage at a rate less than the rate at  which  an
> employee of the opposite sex in the same establishment is paid for equal work  on
> a job the performance of which requires equal skill, effort and responsibility, and
> which is performed under similar working conditions, except where payment is
> made pursuant to a differential based on: a) a seniority system; b) a merit system;
> c) a system which measures earnings by quantity or quality of production; or
> d) any other factor other than sex.

N.Y. LABOR LAW § 194.  "Claims for violations of the Equal Pay Act and the New York State

Equal Pay Act may be evaluated under the same standard."  *Rose v. Goldman, Sachs, & Co.,*

*Inc.*, 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001).

To support her claim that defendants violated the EPA, Moccio points to compensation

records showing that, for the years 2006, 2007, and 2008, Moccio was paid less than three male

SEAs: Jeff Grabelsky, Ken Margolies, and Peter Lazes.  Pl.'s Opp'n 23 (citing Defs.' 56.1 Ex.

90).  But Moccio fails to make out a *prima facie* case of an EPA violation.  Despite extensive

document and deposition discovery on this issue, Moccio has failed to point to any evidence in

the record that tends to show that these three men did jobs that were "substantially equal in skill,

effort, and responsibility" to Moccio's.  *Lavin–McEleney*, 239 F.3d at 480.

To be sure, Moccio attests that these men were SEAs, like Moccio; that none had a higher

education than Moccio—Lazes, like Moccio, had a Ph.D. while Grabelsky and Margolies had

only masters degrees; and that none, after the 2005 Extension Division reorganization, was the

head of a thematic group.  *See* Pl.'s 56.1 ¶¶ 171–77.  But Moccio has pointed to no evidence

whatsoever in the record—whether in the form of the nature of their work, the level of skill

required, work history, job performance, or otherwise—to establish either that she and these

three men "perform equal work on jobs requiring equal skill, effort, and responsibility," or that

their "jobs are performed under similar working conditions," two of the three prerequisites for a

[41]

*prima facie* EPA claim.  29 U.S.C. § 206(d)(1).  Defendants attest, and Moccio does not dispute, that the main factors used to set the salary of an SEA are the salary negotiated upon the SEA's hire and the employee's annual performance-based increases; additional factors include: years of experience; the level and discipline of the terminal degree; market comparators for people in the same field at different institutions; years of service at Cornell; and specific responsibilities.  Defs.' 56.1 ¶ 180; Bruyere Aff. ¶ 5.  Moccio fails to put forward any evidence that reflects on the two primary factors; and is silent on other factors, including the purported comparators' specific responsibilities and performances, save for their years of service at Cornell, the level of their terminal degrees, and their job titles.

The meager evidence at hand, in fact, supports a finding that these three men are clearly *not* appropriate comparators.  For example, Grabelsky, who joined ILR in 1989, is the Director of Cornell University's Construction Industry Program, *see* Pl.'s 56.1 ¶ 172; *id.* Ex. 59, and Lazes, who joined ILR in 1985, is the Director of the Programs for Economic Transitions, Strategic Planning Programs for Unions, and the Healthcare Transformation Project at ILR, *see* Pl.'s 56.1 ¶ 174; *id.* Ex. 60.  These men work in different fields, were placed in different thematic groups, and directed institutes with quite different missions from Moccio's and the IWW's.

In any event, if Grabelsky, Margolies, and Lazes were appropriate comparators solely by dint of their being SEAs who were not thematic leads after the 2005 reorganization, the appropriate comparison would necessarily also have to include the other male SEAs that were not thematic leads; these include Sean Sweeney, Lee Adler, Gene Carroll, and Tom Quimby. *See* Defs.' 56.1 Ex. 88; *Lavin–McEleney*, 239 F.3d at 481 ("the problem with comparing [a] plaintiff's pay only to that of a single male employee is that it may create the impression of an [EPA] violation where no widespread gender discrimination exists").  Moccio has not, however,

alleged that these other male SEAs are appropriate comparators.  The reason for Moccio's

selectivity among male SEAs is apparent:  The same compensation records that reveal that

Grabelsky, Margolies, and Lazes earned more than Moccio in 2006, 2007, and 2008 also reveal

that Moccio out-earned Sweeney in two of the three years, and Adler, Carroll, and Quimby in all

three.  *See* Defs.' 56.1 Ex. 90; *id.* ¶ 181; Pl.'s 56.1 at 113 (admitting).  Thus, her *prima facie* case

fails for the alternative reason that just as many male SEAs earned a lower salary as Moccio as

earned a higher one.  Moccio, thus, fails to carry her burden on her equal pay claims.

### B.  Gender Discrimination Under Title VII

Defendants move for summary judgment on Moccio's Title VII gender discrimination

claim, arguing that the evidence does not establish a *prima facie* case of discrimination.  For the

reasons that follow, the Court agrees.

When there is no direct evidence of discrimination, discrimination claims under Title VII

are guided by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).  Under this analysis, the plaintiff bears the initial burden of establishing a *prima*

*facie* case of discrimination.  To do so, a plaintiff must point to evidence in the record showing

that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for his or her

position; (3) plaintiff was subjected to an adverse employment action; and (4) the adverse

employment action took place under circumstances giving a rise to an inference of

discrimination based on plaintiff's membership in the protected class.  *See Gorzynski v. Jetblue*

*Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).  A plaintiff is not "required to prove the

prohibited motivation was the sole or even the principal factor in the decision, or that the

employer's proffered reasons played no role in the employment decision."  *Finn v. N.Y. State*

*Office of Mental Health Rockland Psychiatric Ctr.*, No. 08-cv-5142, 2011 WL 4639827, at *10

(S.D.N.Y. Oct. 6, 2011) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001)).

Instead, the plaintiff "must show that those were not the only reasons and that plaintiff's

protected status contributed to the employer's decision." *Id.*  Despite this liberal standard, on

summary judgment, a plaintiff must offer "concrete particulars" to substantiate his or her claim.

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied,* 474 U.S. 829 (1985).  A plaintiff

cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination,

absent any concrete particulars." *Meiri*, 759 F.2d at 998.

     If the plaintiff can demonstrate a *prima facie* case, "the burden of production shifts to the

employer to articulate a legitimate, clear, specific and non-discriminatory reason" for having

undertaken the adverse action.  *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

"If the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove

that the employer's reason was merely a pretext for discrimination." *Id.*

     Here, defendants make two principal arguments.  First, even assuming that Moccio could

establish the first three elements of a *prima facie* case of discrimination, she cannot establish the

fourth, because the circumstances under which she was terminated do not give rise to an

inference of discrimination. *See* Defs.' Reply 3–5.  Second, even if Moccio were able to establish

a *prima facie* case of gender discrimination, defendants have met their burden of proffering a

legitimate, non-discriminatory reason for terminating her: namely, as part of a broader reduction

in workforce caused by budgetary shortfalls.  The Court considers these arguments in turn.

### 1.   Moccio has failed to establish a prima facie case of gender discrimination

     It is undisputed that Moccio satisfies the first three prongs of her gender discrimination

claim: As a woman, she is a member of a protected class under Title VII, *see* 42 U.S.C. § 2000e-

2(a); it is undisputed that she was qualified for her position; and termination of employment is

[44]

the quintessential materially adverse employment action.  *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).[10]  Accordingly the Court focuses on the final element of such a claim: whether the surrounding circumstances give rise to an inference that Moccio's termination arose out of discrimination on the basis of her gender.

Moccio alleges the following facts as the basis of her assertion that her termination arose out of gender discrimination: (1) female Extension Division employees were paid less than male Extension Division employees, *see* Pl.'s 56.1 ¶ 35; (2) the 2008 terminations affected women SEAs significantly more than men SEAs, *see* Pl.'s Opp'n 20; and (3) defendants regularly treated Moccio worse than similarly situated men, *see id.* at 20–21.

### a.  Moccio has not demonstrated gender-based unequal pay

If substantiated, the claim of gender-based unequal pay would establish gender discrimination.  However, the Court has already found that Moccio fails to establish a *prima facie* case of unequal pay.  For the reasons noted, the data with regard to pay noted by Moccio does not tend to show that her termination was motivated by her gender.

### b.  Moccio has not demonstrated that statistical evidence supports an inference of discrimination

Next, Moccio asserts that statistical evidence supports an inference that her termination was motivated by discrimination.  Moccio relies on *Leibowitz v. Cornell*, 584 F.3d 487, 502 (2d Cir. 2009), arguing that the Second Circuit there "found evidence sufficient to satisfy the fourth prong . . . where Cornell . . . laid off plaintiff because of an alleged 'financial exigency' . . . but each individual selected was a female."  Pl.'s Opp'n 19.  Although Moccio is right that statistical

---

[10] Moccio alleges other adverse employment actions, but for the reasons stated *infra*, *see* Section IV.D.3, the Court finds that none of these other actions were adverse employment actions.

evidence may give rise to an inference of gender discrimination, the evidence in this case does not support such an inference.

It is undisputed that Moccio was terminated as part of a reduction in force. The reduction in force, announced to the faculty and staff of the ILR School in October 2008, was preceded by various written notifications that such terminations were likely forthcoming. *See* Defs.' 56.1 Ex. 75 (October 28, 2012 announcement of reduction in force); *see, e.g.*, Defs.' 56.1 Ex. 66 (August 12, 2008 email message from Dean Katz to the ILR School stating that "[w]hile a significant cut is clearly on its way, final decisions on the size of the mid-year cut have not been made"); *id.* Ex. 69 (August 28, 2008 email message from Dean Katz to the ILR School stating that "we are facing serious challenges now that will affect future revenues," which would "most likely involve making additional cuts"); *id.* Ex. 73 (September 26, 2008 email from Dean Katz to the ILR School stating that the next round of cuts "will require some reductions in workforce in the Extension Division").

To be sure, "'even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons.'" *Leibowitz*, 584 F.3d at 504 (quoting *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 111 (2d Cir. 1992). In other words, where an employer terminates multiple employees at once based on financial exigency, it is unlawful for the employer to select, based on a discriminatory animus, the particular employees to be terminated.

The statistical evidence of gender discrimination here is not, as Moccio claims, "stronger than in *Leibowitz*." Pl.'s Opp'n 19. Quite the contrary: In *Leibowitz*, every faculty member or staff employee terminated in the 2001–2002 reduction was female. *Leibowitz*, 584 F.3d at 495;

[46]

*see also* Pl.'s Opp'n 19.[11]  The reduction in force here affected 17 people, 14 of whom were

faculty, which Moccio agrees is the relevant point of comparison.  Defs.' 56.1 Ex. 75; Oral Arg.

Tr. 10.  And, of the 14 faculty members terminated, 11 were women and three were men.  Defs.'

56.1 Ex. 90 at appx. B; Oral Arg. Tr. 10.  Defendants' expert conducted a statistical regression

using the undisputed data relating to the demographics of the Extension Division and the

individuals terminated.  That analysis demonstrated that the number of women terminated, given

that the Extension Division faculty was predominantly female, was not statistically significant.

*See* Defs.' 56.1 Ex. 90.  Moccio's expert report, which focused instead exclusively on

purportedly unequal compensation, did not dispute that finding.  *See* Defs.' 56.1 Ex. 91.

      "The sine qua non of a gender-based discrimination action claim . . . is that the

discrimination must be because of sex."  *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007)

(internal quotation marks omitted).  That Moccio was a woman and was terminated is not nearly

enough to support an inference of discrimination.  *See, e.g.*, *Zito v. Fried, Frank, Harris, Shriver

& Jacobson, LLP*, No. 09-cv-9662, 2012 WL 2333303, at *11 (S.D.N.Y. June 19, 2012)

(granting employer summary judgment where plaintiff relied "on the act that she was terminated

and that she was 56 years old and female," "particularly in the context of a group-termination

[reduction in force]"); *Sgarlata v. Viacom, Inc.*, Nos. 02-cv-7234 and 03-cv-5228, 2005 WL

659198, at *7 (S.D.N.Y. Mar. 21, 2005) (granting employer summary judgment where plaintiff

---

[11] Although *Leibowitz* also involved a reduction in force in the ILR School's Extension Division,
it is undisputed that the reduction here was decided upon by a different dean.  Moccio does not
argue that the fact that *prima facie* evidence of discrimination was found in connection with the
earlier reduction in force is probative of discrimination here.  *Compare Leibowitz*, 584 F.3d at
494 (discussing "Dean Lawler['s] . . . decision not to renew her [Leibowitz's] contract"), *with*
Defs.' 56.1 Ex. 75 (Dean Katz's announcement to the ILR School of the reduction in force), *id.*
Ex. 76 (Dean Katz's letter notifying Moccio of her termination), *and* Moccio Dep. at 149
(clarifying that Dean Katz is the only individual that Moccio alleges to have discriminated
against her).

was terminated as part of a department-wide reduction in force, his job duties were absorbed by co-workers, and plaintiff offered only his own belief that he had been discriminated against); *Pisana v. Merrill Lynch & Co.*, No. 93-cv-4541, 1995 WL 438715, at *3–5 (S.D.N.Y. July 24, 1995) (courts place a greater burden on plaintiffs terminated as part of a reduction-in-force to prove intent to discriminate).  Moccio has failed to come forward with statistical evidence fairly supporting an inference that the difference between the number of women, and the number of men, terminated in 2008 resulted from discrimination.

### c.  Moccio has not demonstrated gender-based unequal treatment

Finally, Moccio claims that defendants regularly treated her worse than similarly situated men, supporting an inference that her termination was motivated by discrimination.  A plaintiff seeking to meet her initial burden via a showing of disparate treatment must demonstrate that she is "similarly situated in all material respects" to the individuals with whom she seeks to compare herself.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Quinby v. WestLB AG*, No. 04-cv-7406, 2007 WL 1153994, at *7 (S.D.N.Y. Apr. 19, 2007) (citing *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir. 1996)).  What constitutes "all material respects" varies from case to case, but "must be judged based on [ ] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards."  *Graham*, 230 F.3d at 40.  The standard requires "a reasonably close resemblance of facts and circumstances."  *Id.*; *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

[48]

Here, Moccio makes a specific allegation that she was treated differently than a similarly situated man as to only one incident: when Dean Katz relocated Moccio to a different, and allegedly inferior, office space. Specifically, Moccio alleges that that Dean Katz originally asked Sean Sweeney to move offices, but when Sweeney objected, Dean Katz relented and made Moccio move instead. *See* Pl.'s 56.1 ¶¶ 39, 40, 52. However, Moccio offers no evidence that she and Sweeney were similarly situated employees, instead relying on her own testimony that Sweeney was "less qualified" than she and that he "ha[d] not been employed at Cornell nearly as long as [she] had been." Moccio Aff. ¶ 43. In fact, the record evidence on this issue uniformly suggests that Moccio and Sweeney were *not* similarly situated with respect to the issue of office placement. *See, e.g.*, Mooney Aff. ¶ 8 (attesting that she decided to move Moccio's office because "I knew that she was very rarely in the office, preferring instead to work from home"); Defs.' 56.1 Ex. 50 (email message from Sally Alvarez, Sweeney's supervisor (and a woman), stating that "the illogic and unfairness of moving him [Sweeney] rather than Francine [Moccio] has become an issue . . . . and it's insulting to those of us who work hard and play by the rules"); Mooney Aff. ¶ 9 (Mooney was aware that Alvarez objected to Sweeney being subject to the office move because Moccio rarely utilized her office). Moccio's perception that maintaining her old office was symbolically meaningful as "a symbol of the work done by the IWW," Moccio Aff. ¶ 32, and her annoyance that she purportedly received differing explanations from ILR School leadership regarding the motivation of the office move, *see* Pl.'s 56.1 ¶¶ 41, 43—including "overall space needs," the need to "centrally locate the office[s] of all Thematic Leads," or Moccio's "implicit flex-place understanding," Moccio Aff. ¶ 33—are insufficient to establish that she was treated differently from a similarly situated male colleague on the basis of gender. In sum, because the one concrete instance of disparate treatment to which Moccio points

[49]

does not come close to evidencing gender discrimination, it does not assist her in establishing the necessary *prima facie* case.

To sustain her claim of gender discrimination, Moccio also points to negative language used about her by two Extension Division administrators, which she claims was stereotypic, and was not used towards male colleagues. She also appears to assert that three other actions by ILR School personnel with respect to her reflected discriminatory animus on account of gender: (1) Katz's failure to conduct the investigation she requested as to whether there was gender-based pay inequality at the Extension Division following Moccio's January 7, 2008 complaint, *see* Pl.'s Opp'n 16; (2) defendants' request that Moccio register with the State of New York as a lobbyist, *see* Moccio Dep. at 115; and (3) Katz's decision to give Moccio a below-average pay increase, *see id.* at 143; Pl.'s 56.1 ¶ 52. Moccio implicitly argues that the animus reflected in these emails and actions is probative in assessing whether the later decision to terminate her was made on the basis of gender.

Discriminatory or stereotypical remarks are admissible in gender discrimination cases because they may tend to show discriminatory animus. Whether remarks by defendants or defendants' employees support an inference of discrimination depends on the context, and whether, fairly considered, these remarks are either themselves probative of discrimination, or "tend[] to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007). In determining whether a particular remark is probative of discrimination, courts consider four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view

the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Here, Moccio points to two email messages as supporting an inference of discrimination: the January 30, 2008 email from Grasso stating that she was "truculent," "obstinate," and that her actions were "insubordination," Defs.' 56.1 Ex. 52; and the February 17, 2008 email from Seeber, Cornell's Vice Provost for Statutory Affairs, that stated, in reference to Moccio, that "[t]his long festering sore needs to be dealt with," Defs.' 56.1 Ex. 54, at 2. In particular, she asserts, "Grasso's email characterized the male-dominated ILR School as 'reasonable' while I am 'unreasonable' and 'oppositional for the sake of opposition.'" Moccio Aff. ¶ 29.

In arguing that the language in these two emails supports an inference of discrimination, however, Moccio takes this language far out of context. She thus obscures her conduct, to which the two emails were addressed, and the (at very best) tenuous relationship between these emails and her later termination as part of the RIF. The emails were not made by a defendant in this action or by anyone responsible for her termination: Moccio admits that Dean Katz, not Grasso or Seeber, decided to terminate her employment, and that Dean Katz alone had authority to do so. *See* Moccio Dep. at 149. And the emails were made in a context entirely different from her termination: They arose during discussions in early 2008 referencing Moccio's earlier refusals to move offices and fill out a flex-place agreement. By contrast, Dean Katz's decision to terminate Moccio was not made until more than eight months later, as part of the much broader RIF occasioned by budget shortfalls.

Finally, the emails, although containing pungent prose, were clearly addressed to specific instances of what faculty and administrators—male and female—regarded as unwillingness on Moccio's part to work collegially or abide by administrative decisions within the ILR School.

[51]

The two emails were thus a far cry from the paradigmatic context in which supervisors
(ordinarily male) use gendered code language to marginalize or exploit a female employee's
strong personality or demeanor.  In particular, as set out earlier, the conflicts between Moccio
and Extension Division administrators dating to 2005 were well documented, and the supervisors
with whom she had clashed included men and women.  *See, e.g.*, Defs.' 56.1 Ex. 3 (October 28,
2005 email in which Mooney, a woman, referred to "Francine's hostility" toward Metzler, the
new thematic lead of the group to which Moccio had been assigned); *id.* Ex. 6 (an email in which
Dean Bruyere, a woman, requested that Moccio "meaningfully integrate" into the new structure
of the ILR School); Mooney Aff. ¶ 5 (discussing having witnessed a November 3, 2005 a
conflict between Moccio and Deans Katz and Bruyere over the ILR reorganization, which
Moccio opposed); Defs.' 56.1 Ex. 11 (November 2005 email from Abbott, the ILR Human
Resources Director, to Peagler, both women, stating that Moccio was "not responding very well
to the recent reorganization of the extension division" and requesting advice "in terms of how to
guide the meeting [with Moccio] such that it doesn't turn into another disaster"); Defs.' 56.1 Ex.
13 (November 22, 2005 email from Metzler stating that Moccio's treatment of him was
"consistently rude, impolite, and disrespectful"); *id.* Ex. 20 (December 14, 2005 email in which
Abbott described Moccio's continued "insubordinate behavior"); *id.* Ex. 26 (January 16, 2006
email from Abbott informing Moccio that her "demonstrative behavior is disrespectful,
borderline insubordinate, and certainly making me uncomfortable"); *id.* Ex. 64 at 2 (June 4, 2008
email from Turkett, the ILR School Director of Human Resources, referring to Moccio's "refusal
to move as insubordination").  When read in context (and not divorced from it), the two emails,
from Grasso and Seeber, on which Moccio relies represent nothing more than the

characterizations by these two employees of this long-running and well-documented conflict between Moccio and, by then, various administrators and faculty at the ILR School.

"[D]iscrimination does not lurk behind every inaccurate statement." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). The same is true of every pejorative statement. Viewed as a whole, the extensive documentary record reflects at least seven Cornell University and ILR School administrators using negative or derisive language to discuss Moccio over a four-year period; three of those administrators were women. None of the language that Moccio claims is evidence of gender discrimination was written or spoken by Dean Katz, the one person who decided to terminate her. Accordingly, under the multi-factor analytic framework set out by the Second Circuit in *Wyeth Pharmaceuticals*, the Court finds that no reasonable jury could infer gender bias from the language used in the two emails to describe Moccio's conduct.

The other actions of which Moccio complains—her disappointing 2% pay increase and the directive that she register as a lobbyist—do not themselves evidence discriminatory intent. Nor does Moccio's claim that defendants failed to investigate her January 7, 2008 complaint of gender-based unequal pay. Moccio has not pointed to any provision in Title VII, or case law, to support her claim that a failure to so investigate is evidence of a Title VII violation. Nor has she identified a legal or factual basis to conclude that defendants had a duty to investigate her claims of unequal pay.[12]

Moreover, the unrebutted evidence submitted by the defense is that a review into possible unequal pay *was* conducted—just not in response to Moccio's demand: Extension Division

---

[12] Further, for the reasons noted, Moccio's claim of unequal pay is deficient as a matter of law, even though Moccio has now had the opportunity to buttress it by the discovery taken in this litigation. *See supra*, Section IV.A.

policy was to review gender parity in compensation each year at the time when salary increases are awarded.  *See* Katz Aff. ¶ 50; Defs.' 56.1 Ex. 48.  Moccio's allegation thus is solely that an investigation was not conducted in response to her particular complaint.  That complaint, made in a January 7, 2008 email, stated:

> It has come to my attention from several female colleagues at ILR Extension Division (Outreach) that there might be a significant pay gap based on gender in the Division. . . . I am requesting that the ILR School voluntarily review, evaluate, and report on the status of pay equity based on male and female salaries among professional staff and faculty in ILR Extension.

Defs.' 56.1 Ex. 48; Pl.'s 56.1 ¶ 29.  Moccio does not allege that she supplied any additional information beyond the conclusory allegations in the January 7 email, or otherwise followed up on it.  Moreover, it is undisputed that Dean Bruyere responded to Moccio the following day, explaining that "[c]ompensation is routinely reviewed by the HR office."  Defs.' 56.1 Ex. 48. Under these assembled circumstances, no reasonable jury could find that the decision by the Extension Division administration not to commence an investigation in response to Moccio's email reflected or was motivated by gender-based discrimination.

Moccio, finally, makes generalized statements about unequal treatment, but, as to the specific episodes in which she claims she was ill-treated, there is no evidence in the record that any other SEA in the Extension Division (male or female) who was similarly situated was treated otherwise.  On the contrary, there is considerable evidence that the policies of which Moccio complains were of general application.  *See, e.g.*, Pl.'s 56.1 ¶ 10 (quoting Katz Dep. at 72–73) (Dean Katz denied Moccio's request that the IWW remain a freestanding institute during the Extension Division reorganization because the new policy required all SEAs to report to a thematic lead so as to resolve the "high fragmentation of programming and coordination"); Defs.' 56.1 Ex. 22 (Fleron requested that Moccio enter into a flexwork agreement because "the

administration is require[es] those for anyone [whose] work is not regularly in the office");
Defs.' 56.1 Ex. 23 (Fleron explained that "such work arrangements . . . [must] be consistent with
the university policy"); Defs.' 56.1 Ex. 38  (Fleron explained, after Moccio resisted filing
updated budgets for IWW, that was "asking of you NO MORE AND NO LESS THAT I am asking
of all WIED team members and that is to provide us adequate information on budget projections
in order to do responsible resource planning"); Defs.' 56.1 Ex. 44 (Dean Bruyere notified the
entire ILR School that "New York State recently amended its Lobbying Act and these changes
affect how Cornell University Government Relations reports lobbying activity to the State," and
that "[i]t is now necessary for those of you who lobby to fill out a report (attached) and return it
to the Dean's Office every two months"); Defs.' 56.1 Ex. 42 (Fleron told Moccio, after Moccio
resisted submitting such registration, that "clearly you and I will both need to be registered. . . .
and I don't think it will be a very onerous task to report it").  Accordingly, the events to which
Moccio points do not support an inference of gender discrimination.

    In summary, even viewing the evidence in the light most favorable to her, Moccio has
failed to present evidence sufficient to permit a reasonable jury to find that her termination was
the product, in whole or part, of discrimination based on gender.  She has not met her burden to
establish a *prima facie* case of gender discrimination.

### 2. Defendants have put forward a neutral justification for Moccio's termination which Moccio has failed to show is pretextual

    The defendants argue that, even if Moccio had come forward with sufficient evidence to
establish a *prima facie* case of gender discrimination, they have identified a legitimate, non-
discriminatory business justification for her termination, *see McDonnell Douglas Corp.*, 411
U.S. 792, namely, an ILR School reduction in workforce prompted by budgetary shortfalls.  The
Court agrees.  Defendants have adduced substantial, indeed overwhelming, documentary and

testimonial evidence that the ILR School, and the Extension Division in particular, were in increasingly dire financial circumstances between 2006 and 2008, and that these budgetary shortfalls caused the reduction in force that encompassed Moccio.

It is undisputed that the declining financial health of the Extension Division dates to at least 2006. *See* Pl.'s 56.1 at 75; Katz Dep. at 18. Faculty and staff in the Extension Division were notified of such problems in summer 2006. *See, e.g.*, Defs.' 56.1 Ex. 35. In fall 2006, Dean Katz approved a reduction in workforce that involved terminating the entire Diversity and Inclusion thematic group—including six faculty members—and reorganizing the Extension Division from eight to five thematic groups. *See* Katz Aff. ¶ 35; Oral Arg. Tr. 10; Bruyere Aff. ¶ 12. In December 2007, Dean Katz considered additional terminations of Extension Division employees because of "structural deficits," which he believed would "continue to worsen unless new revenues are secured or expenses significantly reduced." Defs.' 56.1 Ex. 43, at 2. At that time, the WIED group had already been identified as a potential target for additional layoffs due to its "projected loss[es]." *Id.*; *see also id.* ¶ 89; Katz Aff. ¶ 39; *supra* note 5. In February 2008, to respond to the anticipated budgetary challenges, Dean Katz again considered extensive cost-cutting alternatives, including "major reductions in WIED since it has a significant operating deficit, with losses over $500,000 projected for this year." Defs.' 56.1 Ex. 55, at 1; *see also id.* ¶ 91; Katz Aff. ¶ 40. In May 2008, Dean Katz considered possible responses to expected state budget cuts; the proposal identified as having the highest expected net savings was elimination of the entire WIED team. Defs.' 56.1 Ex. 65, at 5.[13]

---

[13] Moccio has not provided any evidence disputing defendants' accounts of the financial straits in which the ILR School found itself between 2006 and 2008.

The unrebutted evidence further shows that, in addition to conferring within the ILR School leadership about such cost-cutting alternatives, Dean Katz also alerted faculty and staff aligned with the WIED group of the group's deteriorating finances in 2006, more than two years before Moccio and the other WIED group members were notified of their termination. *See, e.g.*, Defs.' 56.1 Ex. 35 (June 27, 2006 email message from Fleron to the WIED faculty, stating: "As a follow-up to the message you just received about the financial situation of the Extension Division, I want to let you know that I will be talking with each of you about ideas you have for expense reduction and revenue growth for our unit. This deficit situation spotlights our need to generate contracts, grants, programs and projects as quickly as possible and to be ever more mindful of the most effective utilization of our resources.").

Moccio argues that budgetary shortfalls are merely pretext for a termination motivated by discriminatory animus, but she offers no specific evidence to support that claim. Moccio argues that the defendants' explanation must be pretextual because the IWW's secured independent funding from the legislature. Pl.'s 56.1 ¶ 104. During the relevant period, IWW received $100,000 annually from the New York State Department of Labor, and in the 2008–2009 year, actually received a $5,000 increase in state funding. *Id.* ¶¶ 111, 118. Moccio argues that this funding covered the entirety of IWW's budget, *see* Moccio Aff. ¶ 9; that the budgetary constraints affecting other parts of the ILR School and the Extension Division did not affect the IWW, and thus IWW's (and Moccio's) termination must have been motivated by other reasons, namely, gender discrimination directed at her. Pl.'s 56.1 ¶¶ 115, 118.

Moccio's claim that the state funding covered the cost of operating the IWW, however, is not supported by record evidence. On the contrary, defendants have adduced substantial evidence that the $100,000 legislative grant did not cover the costs of operating the IWW. *See*

[57]

Defs.' 56.1 Ex. 82 (showing that the $100,000 did not cover costs such as Cornell University or Extension Division administrative overhead, support staff, conferences, workshops, or materials); Katz Aff. ¶¶ 48–49 (discussing the various administrative expenses to which each program in the Extension Division must contribute funds); *see also* Defs.' 56.1 Exs. 66, 69, 70, 72.  Documentary evidence reflects, in fact, that years before her termination, faculty and administrators had advised Moccio that additional funding beyond the legislative grant was necessary to avoid operating the IWW at a significant annual deficit.  *See, e.g.*, Defs.' 56.1 Ex. 38 (October 16, 2006 email from Fleron to Moccio stating: "As it seems now clear, IWW has . . . $100k from the state of New York for 2006-07. . . . $100k is not enough to sustain the institute's activities, and, exactly as all ILR extension units, IWW will need to have a *budget target* and *specific plan* for securing additional funding to work toward sustainability. . . . I proposed [a $60k income goal] to you.").  On the evidence in the record, a reasonable jury could not find that the budgetary shortfalls facing the ILR School and the Extension Division did not affect the IWW, and that its elimination was therefore a pretext to terminate Moccio.

Finally, it is undisputed that as a part of the 2008 reduction in force, and in line with prior notifications to the WIED team, the entire WEID team was terminated.  *See* Defs.' 56.1 ¶ 102; Pl.'s 56.1 at 79.[14]  In considering various cost-reducing policy alternatives, the ILR School leadership had weighed terminating the WIED team for months before deciding on the reduction in force.  *See* Defs.' 56.1 ¶¶ 90–91; *id.* Ex. 55, at 1 (February 2008 confidential budget report

---

[14] Moccio argues that the WIED team was not terminated in full because Art Wheaton remains employed by the Extension Division.  *See* Pl.'s 56.1 at 80; Defs,' 56.1 Ex. 90.  However, she does not point to any evidence that Wheaton was ever a member of the WIED team.  Instead, she points to unauthenticated websites that appear to generally describe his work.  *See* Marek Aff. Ex. 62 (Dkt. 71-60).  Because Moccio failed to dispute evidence properly in the record in accordance with Federal Rule of Civil Procedure 56.1, the Court deems it undisputed that the WIED team was terminated in full.

which stated that "[t]here could be major reductions in WIED since it has a significant operating deficit"); *id.* Ex. 55, at 1 (May 2008 internal document proposing that eliminating WIED "would greatly improve the cost structure of Extension").  In October 2008, around the same time as Moccio was notified, all seven other employees active in the WIED team were notified that they would be terminated.  Defs.' 56.1 Ex. 90.  Moccio has not adduced any evidence tending to show that Dean Katz, or for that matter any administrator in the ILR School, terminated the seven other members of the WIED group, not to mention the remaining faculty and staff notified of their impending termination in October 2008, as a ruse to cover up their goal of eliminating Moccio on account of her gender.  Without any evidence supporting this audacious thesis, the Court forcefully rejects it as one which no reasonable jury, on the evidence at hand, could find.

Defendants have thus articulated a legitimate, non-discriminatory reason for terminating Moccio: her entire team was terminated as a part of a reduction in force that was implemented due to well-documented budgetary shortfalls.  Moccio has not shown that defendants' proffered rationale for termination is pretext for unlawful discrimination, or that her gender contributed to defendants' decision.  *See Holtz*, 258 F.3d at 78.  Accordingly, the Court grants summary judgment in favor of defendants on Moccio's Title VII gender discrimination claim.

### 3.  Unavailability of personal liability under Title VII

Moccio's gender discrimination claim under Title VII is dismissed as against defendant Katz for an independent reason:  In the Second Circuit, individuals cannot be held personally liable under Title VII.  *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir. 1995) ("[A]n employer's agent may not be held individually liable under Title VII."), *abrogated on other grounds by Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998).  Personal liability is unavailable regardless of

whether a supervisor has been shown to have committed discrimination.  *See Finn*, 2011 WL 4639827, at *10 (citation omitted).

### C. Gender Discrimination Under New York State Human Rights Law § 296(1)(a) and New York City Human Rights Law § 8-102

Defendants also move for summary judgment on Moccio's gender discrimination claims brought under state and local gender law.  The NYSHRL and NYCHRL each make it unlawful "[f]or an employer . . . because of an individual's . . . sex . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. EXEC. LAW § 296(1)(a); N.Y. CITY ADMIN. CODE § 8–107(1)(a).

As to the NYCHRL, gender discrimination claims under the New York City law are subject to a more liberal judicial construction than those brought under state or federal law.  The NYCHRL "requir[es] that courts give the statute an independent and more liberal construction than its federal and state counterparts."  *Sotomayor v. City of N.Y.*, No. 10-cv-3411, 2012 WL 1889780, at *24 (E.D.N.Y. Mar. 24, 2012) (citation omitted) ("The provisions of this [] title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed."); *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) ("[C]laims under the City HRL must be reviewed independently from and 'more liberally' than their federal and state counterparts."); *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 472 (2011) (NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 65 (1st Dep't 2009) ("[C]ourts [must] be sensitive to the distinctive language, purposes, and method

of analysis required by the [NYCHRL], requiring an analysis more stringent than that called for under either Title VII or the [NYSHRL].").

Notwithstanding this more liberal standard of review, under New York law, "gender discrimination claims brought pursuant to the NYSHRL and the NYCHRL are analyzed under the Title VII framework." *Leibowitz*, 584 F.3d at 498 n.1. Accordingly, claims under the NYSHRL and the NYCHRL for discrimination in employment on the basis of gender are subject to the burden-shifting analysis set forth in *McDonnell Douglas*, 411 U.S. at 802–803. *See Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir. 2010); *DeNigris v. N.Y. City Health & Hospitals, Corp.*, No. 09-cv-6808, 2012 WL 955382, at *7 (S.D.N.Y. Mar. 9, 2012); *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29 (1st Dep't 2011); *see also Hanna v. N.Y. Hotel Trades Council*, 851 N.Y.S.2d 818, 822 (Sup. Ct. N.Y. Cnty. 2007) ("as the NYCHRL and federal Title VII address the same type of discrimination, are textually similar, and employ the same standards of recovery, New York courts . . . resolve federal, state, and city employment discrimination claims consistently with *McDonnell Douglas Corp.*").

Under that framework, Moccio must demonstrate: (1) membership in a protected class; (2) qualifications for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination. *See Gorzynski*, 596 F.3d at 110. For the reasons stated above, Moccio fails to establish the fourth prong: There is not evidence in the record sufficient to support an inference that her termination resulted from discrimination. Accordingly, summary judgment must also be granted against her claims under NYSHRL and NYCHRL.

### D.  Retaliation Under Title VII

Moccio also brings a claim against defendants for unlawful retaliation under Title VII. Under Title VII, it is unlawful for an employer to discriminate against an employee because that

employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The statute thus "prohibits an employer from taking materially adverse action against an employee because the employee opposed conduct that Title VII forbids of the employee otherwise engaged in protected activity."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).  Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause."  *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

 "In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp.*"  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  To prove a *prima facie* case of retaliation, a plaintiff must establish: (1) that she participated in a protected activity; (2) that participation in the protected activity was known to the employer; (3) that the employer thereafter subjected her to a materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The burden of proof at the *prima facie* stage has been characterized as "de minimis."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

If this initial burden is met, "a presumption of retaliation arises," and the burden shifts to "the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* (citing *Quinn*, 159 F.3d 759 at 768).  If the employer produces evidence of a non-retaliatory justification for the adverse employment action, then the employee must, in order to avoid summary judgment, "show that retaliation was a substantial reason for the adverse

[62]

employment action" or that the proffered legitimate, non-retaliatory reason was pretextual.  *Id.* (citation omitted).

In her retaliation claim, Moccio alleges that she engaged in protected activity when she complained about gender discrimination and unequal pay, and as a result of that activity, defendants treated her more poorly than her colleagues when they, *inter alia*, forced her to move to an inferior office, gave her a below-average pay increase, demanded that she register with the State of New York as a lobbyist, and, eventually, terminated her, and that these retaliatory actions violated Title VII.  In moving for summary judgment on this claim, defendants argue that (1) Moccio cannot establish a *prima facie* case of retaliation because (a) Moccio did not engage in protected activity, and (b) most acts that Moccio calls retaliatory are not "adverse employment actions" under Title VII; and (2) even if defendants' acts were adverse employment actions, defendants have put forth a neutral justification for them which Moccio has failed to show is pretextual.  For the reasons that follow, the Court does not agree with each part of defendants' analysis, but does agree that defendants' neutral justification for the single adverse employment action that Moccio alleges (her termination) requires granting summary judgment on this claim.

### 1.  Moccio's participation in a protected activity

Defendants argue, first, that Moccio did not engage in a protected activity.  Under Title VII, an employee engages in such an activity when she "has opposed any particular practice made an unlawful employment practice by this subchapter, or because [she] has made a charge . . . in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a); *see Hicks*, 593 F.3d at 166; *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).

Moccio's papers are imprecise as to the specific acts she claims were protected and were the basis for allegedly retaliatory action.  However, the Court construes Moccio to claim that the

following acts on her part were each protected and gave rise to retaliation by defendants:[15] (1) a March 2005 complaint filed with WDELQ against Gene Carroll, whom Moccio alleged harassed her on the basis of gender, *see* Moccio Dep. at 38–39, 73–74, 94–95; (2) Moccio's support of a coworker, Peggy Leibowitz, in Leibowitz's lawsuit against defendants, *see id.* at 125, 141; *see also Leibowitz v. Cornell Univ.*, *supra*; (3) a fall 2005 "informal" complaint to WDELQ against Dean Katz, alleging that his refusal to let Moccio transfer among thematic groups was retaliation for her filing the March 2005 complaint; *see* Moccio Dep. at 80, 83, 92–93; (4) Moccio's January 7, 2008 request that the Extension Division investigate gender-based unequal pay among the faculty and staff, *see* Defs.' 56.1 Ex. 48; *see* Pl.'s 56.1 ¶ 29; and (5) Moccio's April 28, 2008 complaint to WDELQ regarding Dean Katz's decision to move her office, *see* Defs.' 56.1 Ex. 58; Pl.'s 56.1 ¶ 92, and her appeal to the Vice Provost of WDELQ's denial of her challenge to that decision, *see* Defs.' 56.1 Ex. 64, at 3.

Defendants argue that Moccio's January 7, 2008 complaint regarding purported gender-based unequal pay does not constitute protected activity under Title VII, because a plaintiff must "establish that she had a good faith, reasonable belief that a violation occurred," whereas Moccio has not come forward with any evidence supporting her supposition in the January 7 email that "there may be a significant pay gap based on gender."  Reply 7 (citing *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009); Defs.' 56.1 Ex. 48; *see also Sullivan-Weaver v. N.Y. Power Auth.*, 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000) ("Mere subjective good faith belief is insufficient, the belief must be reasonable and characterized by *objective* good

---

[15] In her SAC, and in her written submissions in opposition to defendants' motion, Moccio refers generally to a pattern of retaliatory behavior.  The Court has derived the list of actions set forth in the text from the extensive documentary record and Moccio's deposition.

faith.") (emphasis in original).  Defendants do not make the same argument with respect to the other activities which Moccio claims were protected.[16]

It is not disputed that Moccio subjectively believed, in sending the January 7, 2008 email, that she was challenging unlawful actions by Cornell: Moccio has so asserted in her deposition and her sworn declaration, and defendants have offered no evidence or argument that her claim of pay disparities was made in bad faith.  *See* Moccio Dep. at 38–39, 73–74, 92–95, 125, 141; Moccio Aff. ¶ 40.  However, to satisfy the "protected activity" element of a retaliation claim, a plaintiff must demonstrate not only a good faith, but also a "reasonable belief that the underlying challenged actions of the employer violated the law."  *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *see Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  The Court has found the evidence in this lawsuit insufficient to support a claim for equal pay.  However, Moccio has adequately shown that, at the time of her January 7, 2008 email, she had a reasonable basis for her belief that a gender based pay disparity might exist, in violation of the law.  Indeed, on its face, Moccio's email recites that "several female colleagues at ILR Extension Division" had brought to her attention the fact that there "might be a significant pay gap based on gender."  Defs.' 56.1 Ex. 48; Pl.'s 56.1 ¶ 29.  *But see La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) (plaintiff could "not predicate a retaliation claim on his complaints that he himself was discriminated against on the basis of sex, since there was no reasonable basis for such complaints").

On the other hand, Moccio adduces no evidence that one of the other acts to which she points, providing general support for her colleague Peggy Leibowitz in the course of Leibowitz's

---

[16] In fairness to the defendants, Moccio's papers are elusive as to this claim, and it is not clear that defendants understood her to be identifying each of the above acts as protected.

litigation against Cornell, was a protected activity under 42 U.S.C. § 2000e–3(a).  And Moccio has not presented any evidence that she reasonably believed at the time that she was generally supporting a colleague that she was engaged in a protected activity (let alone that any ensuing action by defendants was traceable, even in part, to such support).  Therefore, the Court will disregard that one activity in considering Moccio's retaliation claim under Title VII.

In sum, the Court finds that Moccio engaged in protected activity when she (1) filed a complaint with WDELQ against Mr. Carroll in March 2005, (2) filed an "informal" complaint with WDELQ against Dean Katz in fall 2005, (3) requested that the Extension Division investigate whether there was evidence to support a finding of gender-based unequal pay in January 2008, and (4) filed an complaint with WDELQ against Dean Katz in April 2008.

### 2.   Defendants' awareness of Moccio's participation in a protected activity

An employer is aware of a protected activity when it "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).  "Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011).  "'Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.'"  *Id.* (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)).

Moccio has satisfactorily shown that defendants were aware of her protected activities.  She has pointed to evidence that Dean Katz personally knew of both the January 7, 2008 email and the April 2008 complaint.  *See* Katz Dep. at 108 (January 2008 complaint); Defs.' 56.1 Ex.

60 (Mooney's email to Dean Katz, dated May 5, 2008, stating: "Moccio has filed a complaint of discrimination (based on gender, age, and family responsibilities) against us related to the upcoming office move."). Moccio has also shown that both the 2005 complaint against Carroll and her 2005 informal complaint against Dean Katz were filed with WDELQ, an office within the ILR School. Knowledge of professionals within the institution tasked with investigating and evaluating claims of discrimination, even if such individuals do not influence the decisionmaker, is sufficient to show general corporate knowledge. *See, e.g.*, *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (general corporate knowledge found where non-decisionmaker had received copy of employee's complaint). Accordingly, Moccio has adequately demonstrated defendants' awareness of her participation in protected activities.

### 3.   With the exception of Moccio's termination, the alleged retaliatory acts are not adverse employment actions

A plaintiff sustains an adverse employment action if she endures a "materially adverse change" in the terms and conditions of employment. *See Galabya v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). Employer actions "are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Hicks*, 593 F.3d at 165 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Whether an employer's action could dissuade a reasonable employee, situated similarly to the plaintiff, from making a charge of discrimination is an objective determination. *See Tepperwien*, 663 F.3d at 567. "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.* at 568. However, to be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v.*

[67]

*City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks omitted).  "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." *Millea v. Metro–North R.R.*, 658 F.3d 154, 165 (2d Cir. 2011) (quoting *Ellerth*, 548 U.S. at 68).  Actions "sufficiently disadvantageous" so as to constitute an adverse employment action "include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (citation and internal quotation marks omitted).

Here, Moccio alleges that Dean Katz engaged in a series of retaliatory actions, starting in 2005 and ending with notice of her termination in October 2008.  The Court construes Moccio to identify the following as adverse employment actions: (1) Katz's decision, after the ILR reorganization, to assign Moccio to a thematic group without "giv[ing] [her] any choice" as to which group, *see* Moccio Dep. at 101; (2) Katz's decision to assign Moccio to report to a thematic lead rather than the dean, *see id.* at 38; (3) Katz's initial refusal to permit Moccio to transfer to a different thematic area, *see id.* at 97; (4) Katz's decision to relocate Moccio to a different, allegedly inferior, office space, *see* Pl.'s 56.1 at 11; (5) Katz's decision to give Moccio a below-average pay increase, *see* Moccio Dep. at 143; (6) Katz's "refus[al] to try to raise funds [for the IWW] when he was in Albany," Moccio Aff. ¶ 40; (7) Katz's "refus[al] to even try to rename the IWW in Betty Friedan's honor," *id.*; (8) Katz's publishing of correspondence that

"indicat[ed] falsely that the IWW had financial problems," *id.*; and finally (9) Katz's decision to terminate Moccio's employment.[17]

      With the exception of the termination of her employment, none of the actions to which Moccio points meets the requisite standard.  It is not a materially adverse change in a term or condition of employment to require an employee to adjust to organizational changes or to report to a new supervisor, or for an employer to fail to explain to an employee the rationale behind a policy change.[18]  Nor has Moccio established that Dean Katz had a duty to affirmatively inform his employees, or obtain their approval, as to who would be their supervisor, which thematic group to which they would be assigned, which office space they were to be assigned, or as to day-to-day business judgments entrusted to him, whether relating to fundraising efforts or the names of academic institutes.[19]  And it is quite unpersuasive to claim that defendants' attempt to assure compliance with state lobbyist registration laws were actually adverse employment actions taken against Moccio.  These actions are, at most, the sort of "minor annoyances," that do not rise to the level of actionable retaliation under Title VII.  *Millea*, 658 F.3d at 165.

---

[17] Although Moccio claims that other individuals took adverse actions against her as part of a pattern of retaliation—*e.g.*, Grasso's October 17, 2008 letter to Moccio "falsely accus[ing] [her] of performance issues," *see* Pl.'s 56.1 ¶¶ 127–29—she has explicitly limited her retaliation claim to actions taken against her by Dean Katz.  *See* Moccio Dep. at 149 ("Q: So my question is: Are there any other actions or any individual people, who you are claiming illegally discriminated against you based on your sex, other than Harry Katz? A: No. . . . Q: Is there anyone other than Harry Katz that you are accusing of illegal retaliation? A: No.").

[18] *See* Moccio Aff. ¶ 25 ("Nobody ever told me that the reason for my office move was to put thematic leads closer together within ILR Extension.").

[19] Indeed, defendants are under no legal duty to be truthful in explaining to Moccio the reasons, for example, for moving her office.  *See Fisher*, 114 F.3d at 1368–69 ("Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as . . . institutional politics, . . . or personal hostility.").

### 4.  As to her termination, Moccio has made a limited showing of a causal nexus

Moccio has demonstrated that she participated in protected activities that were known to defendants, and that she was thereafter subjected to a materially adverse employment action.  *See Kaytor*, 609 F.3d at 552.  To establish a *prima facie* case for retaliation under Title VII, Moccio must adduce evidence showing that at least one of the four activities which the Court has found protected influenced defendants' decision to terminate her employment.  Causation of an adverse employment action traceable to a protected activity may be established "'either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"  *Hicks*, 593 F.3d at 170 (quoting *Gordon*, 232 F.3d at 117); *see also Milne v. Navigant Consulting, Inc.*, No. 08-cv-8964, 2012 WL 3283454, at *8 (S.D.N.Y. Aug. 13, 2012) (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).  In addressing this issue, "the court's role . . . is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)).

Here, the record is devoid of direct evidence of discriminatory animus.  Moccio instead relies on indirect evidence, in particular, (1) temporal proximity of events; (2) negative statements by Extension Division faculty and administrators; and (3) Dean Katz's alleged disparate treatment of Moccio and others.  The Court evaluates these claims in turn.

#### a.  *Temporal proximity does not demonstrate causation*

The occurrence of an adverse employment action shortly after protected conduct may give rise to an inference of causation so as to make out a *prima facie* case of retaliation. "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor,* 609 F.3d at 552; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). However, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Flood v. UBS Global Asset Mgmt.*, No. 10-cv-374, 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (citing *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011)); *see also Chin-McKenzie*, 2012 WL 2512942, at *12 (collecting cases).

Moccio argues that the temporal proximity between her protected acts and termination is sufficient to give rise to an inference of retaliation. *See* Pl.'s Opp'n 13–14. Moccio's protected activities, as found by the Court, occurred in March 2005, fall 2005, January 2008, and April 2008. The latest of these—the April 2008 discrimination and retaliation complaint against Dean Katz filed with WDELQ—was the subject of a full internal investigation and a 12-page report,

dated May 31, 2008.  It denied Moccio's claim that "any statements or conduct by ILR administration [was] sufficient to evidence discriminatory behavior or an intention to discriminate."  Defs.' 56.1 Ex. 63, at 1.  Moccio appealed the dismissal of her complaint to Vice Provost Siliciano; her appeal was denied in July 2008.  Defs.' 56.1 Exs. 64, 65.

It was not until October 28, 2008—six months after her final complaint against Dean Katz, and at least three months after final resolution of that complaint—that Moccio was notified that she would be terminated.  That gap is longer than the period which courts in this circuit have held sufficient to justify an inference of causation.  *Clark Cnty. Sch. Dist.*, 532 U.S. at 274; *see, e.g.*, *Flood*, 2012 WL 288041, at *17.

Further undermining any such inference, the record evidence persuasively shows that, unlike in cases where temporal proximity was found to support an inference of causation, the defendants had been considering taking the adverse employment action (the 2008 layoffs, in the Extension Division generally and in the WIED group specifically) in advance of the plaintiff's protected activities.  An employer's decision to "proceed[] along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist.*, 532 U.S. at 272.  There is documentary evidence that such layoffs were contemplated as early as December 2007, prior to the last two protected acts (and more than two years after the first two).  *See* Defs.' 56.1 ¶ 89; *id.* Ex. 43 (discussing "trigger[ing] another layoff"); Katz Aff. ¶ 39.  Layoffs in the WIED group were discussed again in a February 2008 internal budget report, *see* Defs.' 56.1 Ex. 55, at 1 ("There could be major reductions in WIED since it has a significant operating deficit . . . ."), and yet again in May 2008, and multiple additional times after Moccio's April 2008 complaint.  *See, e.g.*, Defs.' 56.1 Ex. 65, at 5 (discussing that eliminating WIED "would greatly improve the cost structure of Extension.").

[72]

In sum, the timeline of events here does not come close to resembling the circumstances in which courts have inferred causation on the basis of a short passage of time between protected activity and an adverse employment action.  The Court therefore rejects Moccio's claim that that causation can be inferred based on "temporal proximity" of these events.

### b.  Disparate treatment of employees does not demonstrate causation

Moccio argues that defendants' disparate treatment of her vis-a-vis her colleagues, in particular various burdens placed on her that she argues were not placed on others, shows that defendants were retaliating against her for her protected conduct.  *See* Pl.'s Opp'n 15; *see supra* Section IV.B.1.c.  She points to (1) Dean Katz's decision to relocate her to an allegedly inferior office space, *see* Pl.'s 56.1 ¶¶ 39, 40, 52; (2) defendants' request that she register with the State of New York as a lobbyist, *see* Moccio Dep. at 115; and (3) Katz's decision to give her a below-average pay increase, *see id.* at 143.  These episodes, fairly considered, do not support a claim of retaliation.

As to the request to move to an inferior office, although it theoretically could reveal a retaliatory animus, the undisputed facts defeat such a claim here.  The plan to move offices associated with the IWW, and Moccio's chronicled resistance to such a move, dates back as of February 2006, long before the January 2008, Moccio complained of unequal pay.  *See* Defs.' 56.1 ¶ 68; *id.* Ex 28; Pl.'s 56.1 at 66; Mooney Aff. ¶ 6.  On the record at hand, no jury could reasonably conclude that the original, 2006 plan to move offices was an act of retaliation: Moccio's protected activities to that point were her March 2005 complaint against Carroll and her fall 2005 complaint against Dean Katz, but there is no evidence linking the 2006 plan to move offices to those complaints, and a substantial gap in time separates these events.  Nor is there evidence that the eventual office move in 2008—discussed in January 2008, approved by

Dean Katz on April 22, 2008, communicated to Moccio the following day, and implemented in July 2008—had anything to do with Moccio's January 7, 2008 complaint. Defs.' 56.1 Ex. 56. To the contrary, the evidence is that efforts were made to *avoid* moving Moccio's office, given her sensitivity on this issue. *See* Mooney Aff. ¶ 8 (attesting that she asked Mr. Sweeney to move in 2008 was "because I was looking to avoid a confrontation with [Moccio]"). Accordingly, on the record at summary judgment, no "fair-minded jury" could find retaliatory animus without engaging in "unsubstantiated speculation." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553–54 (2d Cir. 2005) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

As to the directive that Moccio comply with state lobbyist registration requirements, the request that Moccio and her colleagues register as lobbyists pursuant to that law was made in December 2007, long after Moccio's 2005 complaints and before her January 2008 complaint. There is no evidence that this directive had anything to do with Moccio's earlier complaints, or indeed, anything to do with Moccio in particular: It was sent to the entire ILR School, *see* Defs.' 56.1 Ex. 44, and applied to other SEAs as well. *See id.* Ex. 42.

Finally, defendants' justifications for giving Moccio somewhat below-average pay increases in 2006 (2% instead of 3%) and 2008 (2.5% instead of 3.25%) were well-documented and unrelated to her complaints. These justifications were objectively reasonable given Moccio's track record of being a difficult colleague who did not take well to direction from her supervisors (*e.g.*, resisting the new thematic structure). *See* Marek Aff. Ex. 37; Defs.' 56.1 ¶ 76; *id.* Exs. 32, 33, 39; Katz Aff. ¶ 32. Moccio does not provide any evidence, or reason to believe, that the reasons given for her pay increases were pretextual.

Beyond these specific events, Moccio asserts a general "pattern and practice of discrimination and retaliation" between 2005 and her termination. Moccio Aff. ¶ 25. Although

disputes of fact must be construed in the plaintiff's favor on summary judgment, the Court is not bound to defer to this legal conclusion.  To the extent that Moccio instead means by this phrase to reference the tense workplace relationship which the record amply documents between her and ILR School administrators, such a relationship is inadequate to give rise to an inference that adverse actions represented retaliation for protected conduct.  Even if the evidence showed, as Moccio posits, Dean Katz was in fact trying to "pressure [Moccio] to leave the school," or was "treat[ing] [Moccio] in a different way" from other SEAs, or implemented changes to the organizational structure of the Extension Division that "interfered" with the prior independence of the IWW, none of these events inherently bespeaks unlawful retaliation.  Moccio Dep. at 119; *id.* at 115; Defs.' 56.1 Ex. 16.  The Court, accordingly, finds that the various demands placed upon Moccio, or the treatment or workplace atmosphere she found wanting, would not permit a trier of fact to find a causal nexus between her discrete protected activities and her eventual termination.

### c.   Negative statements by colleagues may demonstrate causation

Moccio argues that statements critical of Moccio made by and among ILR School administrators fairly give rise to an inference that her termination was an act of retaliation for her having engaged in protected activity.  *See* Pl.'s Opp'n 15.  Moccio points to several emails in early 2008, reasonably soon after her January 7, 2008 complaint about unequal pay, in which faculty and administrators in the Extension Division exhibited increasing frustration with Moccio's behavior and complaints.  In particular:

- On January 30, 2008, Grasso wrote, in an email to Dean Katz, Dean Bruyere, and Mooney, that Moccio was "truculent," "obstinate," and that her actions were "insubordination."  Defs.' 56.1 Ex. 52.

- On February 17, 2008, Grasso wrote, in an email to Dean Katz, Dean Bruyere, Seeber, and Mooney, that if the school's insistence upon a flex-place agreement and an office move "set off an explosive response" from Moccio, they could "provide her with yet another difficult performance appraisal," and if she could not "cover her salary with grants or training . . . she would be laid off."  Defs.' 56.1 Ex. 54, at 2.  Grasso added that Moccio could be "terminated for cause due to disruptive, insubordinate behavior, failure to follow University policies, and failure to generate any additional revenue."  *Id.* at 2.  Grasso also added that Kruzansky wrote in an earlier email to him that "it would be bad timing [] to take action against Francine now because all those Albany meetings might focus on Francine as opposed to other issues that ILR would want to discuss."  *Id.*

- On February 19, 2008, Seeber wrote, in an email to Dean Bruyere and Grasso, following a discussion of Moccio's unwillingness to move offices, that "[t]his long festering sore needs to be dealt with."  *Id.*

- On April 22, 2008, Grasso wrote, in an email to Dean Katz, Dean Bruyere, and Mooney, with respect to implementing the office move: "I think we need to be prepared to possibly terminate her if her behavior becomes an issue.  She will claim that we are discriminating against her and threaten some type of action.  If we want, we could use her reaction as a cause for termination."  *Id.* at 1.

On this issue, Moccio has carried her burden of showing that "proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173.  To be sure, Dean Katz did not himself make statements of this nature.  And the language in the emails can comfortably be read to apply to actions other than her

[76]

complaint about equal pay.  However, Dean Katz was party to the emails above, and statements in them (casting Moccio as "disruptive," "insubordinate," "truculent," "obstinate," and a "long festering sore") can also plausibly be read to fault her for complaining.  In the Court's assessment, these emails, coming weeks after Moccio's January 7, 2008 complaint, are sufficient to establish a *prima facie* case of retaliation, *i.e.*, to enable a finder of fact to conclude that Moccio's later termination derived, in part, from a retaliatory animus arising from her equal-pay complaint.

###### 5.  Defendants have put forward a neutral justification for Moccio's termination

Because Moccio has established a *prima facie* case of retaliation, the burden shifts to defendants to provide a legitimate, non-retaliatory reason for her termination.  *See Jute*, 420 F.3d at 173.  Defendants have carried that burden.  As chronicled earlier, there is overwhelming evidence that the ILR terminated Moccio's employment not because of factors particular to her, but as part of a broader workforce reduction caused by budgetary constraints which resulted in the elimination of the entire eight-member WIED group, of which Moccio was a part.  *See supra* Section IV.B.2.  The documentary evidence also clearly shows that defendants had considered extensive layoffs within the WIED group in December 2007, before Moccio's January 2008 equal-pay complaint.  There is no evidence, and Moccio cannot credibly argue, that the WIED layoffs were motivated by a desire to retaliate for her earlier protected activities, which occurred in 2005.  Defendants have put forward a neutral, and indeed amply corroborated, justification for Moccio's termination pursuant to *McDonnell Douglas*.

### 6. Moccio has failed to show that defendants' neutral justifications are pretextual

Because defendants have shown a legitimate, non-discriminatory reason for Moccio's termination, to avoid summary judgment, Moccio must come forward with evidence sufficient to permit a rational factfinder to conclude that her protected activities were a substantial reason for the adverse employment action, or that defendants' explanation is merely a pretext for impermissible retaliation. Moccio has failed entirely to do so. The documentary and testimonial evidence uniformly establishes that defendants terminated all eight members of the WIED team, including six faculty members (Moccio being one), along with the nine non-WIED faculty and staff in order to respond to a severe budget shortfall. Moccio's suggestion that these 16 other people were all terminated as pretext to camouflage defendants' true intention—to rid themselves of Moccio, in retaliation for her prior protected activities—is utterly uncorroborated and defies credibility. The Court, accordingly, finds that Moccio has failed to present any evidence that the legitimate reason defendants have identified for Moccio's termination was a pretext for unlawful retaliation under Title VII.

### E. Retaliation Under the New York State Human Rights Law and the New York City Human Rights Law

Moccio also brings claims for retaliation under the NYSHRL and the NYCHRL. Section 296(7) of the NYSHRL makes it unlawful for:

> any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

N.Y. Exec. Law § 296(7). "Courts apply the same standard used in Title VII cases in analyzing NYSHRL retaliation claims." *Caban v. Richline*, No. 10-cv-559, 2012 WL 2861377, at *14 (S.D.N.Y. July 10, 2012) (citing *Patane v. Clark*, 508 F.3d 106, 115–17 (2d Cir. 2007)).

Accordingly, the above analysis of Moccio's retaliation claim under Title VII applies in full here.

Defendants' motion for summary judgment on Moccio's claims of retaliation in violation of

NYSHRL § 296(7) is granted.

> Section 107(7) of the NYCHRL makes it unlawful for:
>
> > any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter.

N.Y.C. ADMIN. CODE § 8-107(7).  The same analysis used for retaliation claims under Title VII

applies to retaliation claims under the NYCHRL. *See Richardson v. Comm'n on Human Rights*

*& Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008); *Anderson v. Davis Polk & Wardwell LLP*,

No. 10-cv-9338, 2012 WL 734120, at *13 (S.D.N.Y. Mar. 6, 2012).  To be sure, liability for

retaliation under the NYCHRL is broader than under the companion federal and state statutes,

"in that there is no requirement that the employee suffer a materially adverse action." *Pilgrim v.*

*McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009); *see also Fincher*, 604 F.3d at 723

("New York State courts and district courts in this Circuit have concluded . . . that the retaliation

inquiry under the CHRL is 'broader' than its federal counterpart.").  However, a plaintiff

claiming retaliation under the NYCHRL must still show that her employer was aware she

engaged in a protected activity, and that there was a causal connection between the protected

activity and the employer's subsequent action.  *Pilgrim*, 599 F. Supp. 2d at 469.  For the reasons

discussed above, the record does not support any such finding.  Thus, no reasonable juror could

find that defendants retaliated against Moccio in violation of the NYCHRL.

[79]

### F.  Breach of Contract

Under New York law, "'absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.'"  *Hecht v. Nextel of N.Y.*, No. 10-cv-8740, 2012 WL 2421874, at *6 (S.D.N.Y. June 27, 2012) (quoting *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333 (1987)).  Moccio claims that the March 21, 2007 letter from Dean Katz notifying her that she was being reappointed as an SEA created an employment contract under which she could not be terminated absent good cause.  *See* Defs.' 56.1 Ex. 40.  However, on the undisputed facts, Moccio's employment was clearly at-will, and judgment must be granted in favor of defendants.

To rebut the presumption of at-will employment, an employee must show that he or she "'relie[d] to his detriment on an employer's express written policy limiting its right to discharge.'"  *Gencarelli v. Cablevision Sys. Corp.*, No. 10-cv-4092, 2012 WL 1031441, at *3 (E.D.N.Y. Mar. 27, 2012) (quoting *Chimarev v. TD Waterhouse Investor Svcs., Inc.,* 99 F. App'x 259, 262 (2d Cir. 2004)).  There is no evidence in the record that supports Moccio's claim that ILR, the Extension Division, or, for that matter, Cornell University had any such policy.  It is undisputed that there were "no tenure track faculty appointments in the Extension Division." Defs.' 56.1 Ex. 5.  The March 21, 2007 letter did not limit defendants' right to discharge Moccio. Nor has Moccio pointed to any other document with such effect, or identified any statement on which she, purportedly, relied that could be construed as limiting defendants' right to terminate her.

Moreover, even if the March 21, 2007 letter could somehow be read to limit defendants' right to terminate Moccio, the letter expressly conditioned Moccio's employment on "available funds, satisfactory performance, and available work."  Defs.' 56.1 Ex. 40.  "Under New York

[80]

law, '[e]xpress conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed.'" *Travelers Cas. & Sur. Co. v. Dormitory Auth–State of N.Y.*, 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) (quoting *Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.*, 840 N.Y.S.2d 144, 145 (2d Dep't 2007)).  As noted, defendants have presented compelling evidence that budgetary shortfalls severely limited the funds available to support programming in the Extension Division.  Under these circumstances, the March 21, 2007 letter, conditioning Moccio's employment on "available funds," would not have shielded Moccio from termination in October 2008.  Accordingly, judgment is entered for defendants on Moccio's claim for breach of contract, both because she had no contractual right to continued employment, and because even if she had such a right, the letter on which she relies was subject to a contingency that was clearly met.

## CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is hereby GRANTED.  The Clerk of Court is directed to terminate the motion at docket item 52 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 27, 2012
         New York, New York